965 F.2d 542
 22 Fed.R.Serv.3d 1241
 Christen M. SHANNON, a minor, by her Guardian ad Litem,
Plaintiff-Appellant,
v.
James P. SHANNON and Edith A.R. Shannon, Defendants-Appellants,
v.
UNITED SERVICES AUTOMOBILE ASSOCIATION, Commercial Union
Insurance Companies, Steven Schultz, et al.,
Defendants-Appellees.
 No. 91-2494.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 12, 1991.
Decided June 24, 1992.
Rehearing and Rehearing In Banc
Denied July 30, 1992.
 
 James P. Shannon, Elkhorn, Wis., for plaintiff-appellant Christen M.
 Daniel C. Sullivan, Sullivan & Associates, Oak Brook, Ill., James P. Sullivan, Elkhorn, Wis., for defendants-appellants.
 James T. Lucke, David R. Cross (argued), Quarles & Brady, Milwaukee, Wis., for defendant-appellee West Allis Memorial Hosp. Employee Health Protection Plan.
 Before WOOD, Jr.,* COFFEY, and EASTERBROOK, Circuit Judges.
 HARLINGTON WOOD, Jr., Circuit Judge.
 
 
 1
 Three-year old Christen Shannon, the daughter of James P. and Edith Anne Rachel Shannon, nearly drowned in a lake next to their home on July 1, 1984. Tragically, she suffered extensive brain damage and was left a non-communicative, spastic quadriplegic, requiring 24-hour, life-sustaining, medical care, which she has received at home since December 1984: her airways must be suctioned frequently to prevent blockage, and she is fed through a gastrostomy tube that requires regular monitoring and maintenance. Because Mrs. Shannon worked for West Allis Memorial Hospital, Inc. ("WAMHI"), and was covered by the West Allis Memorial Hospital Employee Health Protection Plan ("Plan"), Christen's medical expenses were initially borne by the Plan. After paying out something over 1.3 million dollars, the Plan terminated its payments in September 1987 and was sued forthwith in federal court: that suit, Case No. 87-C-1206, is not at issue here but is not entirely irrelevant.
 
 
 2
 Through her guardian ad litem Christen, the plaintiff-appellant here, initiated a personal-injury suit against her parents, defendants-appellants, and their insurance company, United Services Automobile Association, defendants-appellees, in state court in 1985. The following year she added her next-door neighbors, Steven and Donna Schultz, who also owned lake-front property, and their insurer, Commercial Union Insurance Companies, all defendants-appellees.[1] The Plan, also a defendant-appellee here, intervened January 29, 1990, to assert subrogation and reimbursement claims under the terms of the plan against Christen and her parents. Christen and her parents each answered the Plan's cross-claims and counterclaims and raised counterclaims against the Plan.
 
 
 3
 The Plan, asserting federal jurisdiction based on the Employee Retirement Income Security Act ("ERISA"), promptly removed the case to the United States District Court for the Eastern District of Wisconsin. 29 U.S.C. §§ 1001 et seq.; 28 U.S.C. § 1441(c). Subsequently, Christen and her parents (collectively, the "Shannons") each sought remand, arguing the Plan was a governmental plan and, thus, exempt from ERISA. 28 U.S.C. § 1447(c); 29 U.S.C. § 1003(b)(1). The Plan, in turn, claiming the Shannons had raised only preempted, state-law claims, moved to dismiss the case for the Shannons' "failure to state a claim upon which relief can be granted." 29 U.S.C. § 1144; Fed.R.Civ.P. 12(b)(6).
 
 
 4
 The district court found the Plan was an ERISA plan, not a government plan, and, accordingly, denied the Shannons' motions to remand.[2] Concomitantly, the court dismissed the suit, stating that the Shannons' claims, "being state law claims, are preempted...." The Shannons appeal.[3] For the reasons stated below we affirm the district court's denial of the motion to remand, but we reverse and vacate its dismissal of the case and remand with instructions.
 
 ANALYSIS
 
 5
 The Shannons question both our jurisdiction to hear this appeal and that of the district court to decide whether the Plan is a governmental plan. They contend the state court is the one that must determine whether WAMHI is an agency or instrumentality of the City of West Allis, Wisconsin ("City"), and, thus, whether the Plan is a governmental plan. 29 U.S.C. § 1002(32).
 
 
 6
 A primordial element of our jurisprudence is that federal courts have jurisdiction to determine whether they have subject matter jurisdiction. The Supreme Court, referring to its early exercise of jurisdiction to determine jurisdiction in Winchester v. Jackson, 7 U.S. (3 Cranch) 515, 2 L.Ed. 516 (1806), stated, "[T]here was jurisdiction in this court to consider and determine the question of jurisdiction of the Circuit Court...." Mansfield, Coldwater & Lake Michigan Railway v. Swan, 111 U.S. 379, 387, 4 S.Ct. 510, 514, 28 L.Ed. 462 (1884). In the eloquent words of Justice Holmes,
 
 
 7
 But even if the Circuit Court had no jurisdiction to entertain Johnson's petition [for writ of habeas corpus], and if this court had no jurisdiction of the appeal, this court, and this court alone, could decide that such was the law. It and it alone necessarily had jurisdiction to decide whether the case was properly before it.
 
 
 8
 United States v. Shipp, 203 U.S. 563, 573, 27 S.Ct. 165, 166, 51 L.Ed. 319 (1906) (citing Mansfield, 111 U.S. at 387, 4 S.Ct. at 514). See also United States Catholic Conference v. Abortion Rights Mobilization, Inc., 487 U.S. 72, 79, 108 S.Ct. 2268, 2272, 101 L.Ed.2d 69 (1988) (citing Shipp, 203 U.S. at 573, 27 S.Ct. at 166).
 
 
 9
 Our jurisdiction to determine jurisdiction is not diminished because an action is initiated in state court and subsequently removed to federal court. See, for example, Mansfield, 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462. Removal of a civil case is not based on a motion that a court, either state or federal, grants or denies; rather, it is a fait accomplis by the party initiating the removal petition. 28 U.S.C. §§ 1441, 1446. "Once the petition is filed in federal court, the state court is divested of jurisdiction over the case." Erwin Chimerinsky, FEDERAL JURISDICTION 234 (1989). Subsequently, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c).
 
 
 10
 Fundamentally, removal is a procedure created by federal statute that permits but does not require a defendant in a state-court suit to move the case to federal court if the plaintiff's action could have been properly brought in federal court. Generally, a case may be removed only if "the suit--as the plaintiff framed or could easily have framed it in the complaint--would have been within the district court's original jurisdiction at the time of the removal." Federal Deposit Insurance Corp. v. Elefant, 790 F.2d 661, 667 (7th Cir.1986) (citing Franchise Tax Board v. Construction Laborers Vacation Trust, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), and Pullman Co. v. Jenkins, 305 U.S. 534, 59 S.Ct. 347, 83 L.Ed. 334 (1939)). Moreover, a defense based on the United States Constitution or federal law does not make the suit removable, and neither does a counterclaim or other similar filing based on federal law. Louisville & Nashville Railroad v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908); Elefant, 790 F.2d at 667 (citing Takeda v. Northwestern National Life Insurance Co., 765 F.2d 815, 822 (9th Cir.1985)).
 
 
 11
 There is an exception which controls in this case. Removal is proper even if federal jurisdiction is not evident from the complaint where, as here, "Congress has clearly manifested an intent to make causes of action within the scope of the civil enforcement provisions of [ERISA] § 502(a) removable to federal court." Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 66, 107 S.Ct. 1542, 1548, 95 L.Ed.2d 55 (1987) (citing 29 U.S.C. § 1132(a)). Accordingly, the Plan's intervention to enforce terms of the plan--namely, its alleged right to subrogation and reimbursement--more than likely invoked ERISA, preemption-based removal. 29 U.S.C. §§ 1132(a)(3)(B)(ii), 1132(e). If it did not, then the Shannons' subsequent counterclaims against the Plan surely did. Whether upon removal the district court had subject matter jurisdiction depends on whether the Plan is a governmental plan, exempt from ERISA. And that determination, in turn, depends upon whether WAMHI is a governmental or private entity.[4]
 
 
 12
 Thus, the district court had jurisdiction to determine whether it had subject matter jurisdiction, whether WAMHI was a governmental entity, and whether the Plan was a governmental plan. It entered a final order, and we, therefore, have jurisdiction over this appeal. 28 U.S.C. § 1291.
 
 GOVERNMENTAL PLAN
 
 13
 The focus of our inquiry is whether WAMHI, the non-profit, corporate lessee and operator of a city-owned hospital facility, known as the West Allis Memorial Hospital ("WAMH"),[5] is a governmental agency or instrumentality.[6] If it is, then, the parties agree the Plan is a governmental plan,[7] exempt from ERISA, and the Shannons would have their suit back in state court where they want it. Conversely, if WAMHI is not, the Plan is not exempt from ERISA, and there is preemption.
 
 
 14
 The decision whether WAMHI is a private or governmental entity must be made according to federal law. On a similar, relevant matter, the Supreme Court in NLRB v. Natural Gas Utility District of Hawkins County, Tennessee, 402 U.S. 600, 602-03, 91 S.Ct. 1746, 1748-49, 29 L.Ed.2d 206 (1971), stated, "Federal, rather than state, law governs the determination, under § 2(2) [of the National Labor Relations Act (29 U.S.C. § 152(2)) ], whether an entity created under state law is a 'political subdivision' of the State...." In this light we agree with the court in Rose v. Long Island Railroad Pension Plan, 828 F.2d 910, 915 (2nd Cir.1987), cert. denied, 485 U.S. 936, 108 S.Ct. 1112, 99 L.Ed.2d 273 (1988): "Because ERISA is a federal statute, the term 'political subdivision' must be interpreted by reference to federal law, in the absence of clear legislative intent to the contrary."But what is the appropriate test? The district court did not say, and we must proceed de novo. The Shannons argue for application of the symbiotic relationship test utilized in Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and the public function test cited in Rendell-Baker v. Kohn, 457 U.S. 830, 842, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982). They also cite Citizens to End Animal Suffering & Exploitation, Inc. v. Faneuil Hall Marketplace, Inc., 745 F.Supp. 65 (D.Mass.1990). These cases, as the Shannons acknowledge, address constitutional issues of free speech, and, we add, the state action doctrine and civil rights. The concern in this case is not with constitutional liberties; rather, it is with proper application of a specific statute to a specific entity to determine whether it must do business according to state or federal law.
 
 
 15
 Moreover, the Shannons' reliance on Rendell-Baker is misplaced. That court did not endorse a generalized, public function test but stated, instead, the relevant question is "whether the function performed has been traditionally the exclusive prerogative of the State." Rendell-Baker, 457 U.S. at 842, 102 S.Ct. at 2772 (quotation marks and citations omitted; emphasis supplied by the Rendell-Baker court). Clearly, hospital care, while serving the public, is not the exclusive prerogative of the State. Additionally, the Court in Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 531, 105 S.Ct. 1005, 1007, 83 L.Ed.2d 1016 (1985), a case arising under the Fair Labor Standards Act (29 U.S.C. §§ 201 et seq.), held that drawing "the boundaries of state regulatory immunity in terms of 'traditional government function' is not only unworkable but is also inconsistent with established principles of federalism...." Garcia went on to expressly overrule National League of Cities v. Usery, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), which had adopted the traditional-government-function test, and, therefore, we think it puts the kibosh on whatever may be left of the Shannons' argument. Garcia, 469 U.S. at 531, 105 S.Ct. at 1007.
 
 
 16
 The appellees argue the essential test is whether the City of West Allis, a government, exercises daily control over WAMHI and cite two Internal Revenue Service Revenue Rulings and one Department of Labor Opinion Letter to that effect. Neither the rulings nor the letter analyze WAMHI itself, and the Secretary of Labor, who is the person with the authority to do so, has published no rule in the Code of Federal Regulations for determining if an entity is a governmental subdivision, agency or instrumentality within the meaning of ERISA, 29 U.S.C. § 1002(32). Furthermore, appellees have not identified any regulation published by the Secretary of Labor in the C.F.R. that defines "governmental subdivision, agency or instrumentality," although some do.
 
 
 17
 The Plan also cites Krupp v. Lincoln University, 663 F.Supp. 289 (E.D.Pa.1987), for the proposition that an employee benefit plan at an institution performing a public function is not a governmental plan. Krupp did hold the University's plan was not governmental, but it did so because (a) the University had long been and was still a private, nonprofit corporation chartered for educational purposes and (b) recent state legislation that established Lincoln University as an " 'instrumentality of the Commonwealth to serve as a State-related institution' " had been enacted solely to provide greater financial support than the previous law had allowed. Id. at 291-92 (quoting 24 Pa.Stat. § 2510-402(7)). Krupp, therefore, is inapposite.
 
 
 18
 We think the proper test is the one implicitly approved, with limitations, in NLRB v. Natural Gas Utility District of Hawkins County, Tennessee, 402 U.S. 600, 602-03, 91 S.Ct. 1746, 1748-49, 29 L.Ed.2d 206 (1971). The test had been enunciated by the NLRB and applied under the National Labor Relations Act ("NLRA") as amended by the Labor-Management Relations Act ("LMRA"), codified at 29 U.S.C. §§ 141 et seq. Since 1971 the test has been regularly applied by federal courts to determine if a particular entity is a governmental subdivision, agency or instrumentality under the NLRA and the LMRA. See, for example, NLRB v. Parents & Friends of the Specialized Living Center, 879 F.2d 1442, 1448 (7th Cir.1989) (not an exempt governmental entity under LMRA; 29 U.S.C. § 152(2)).
 
 
 19
 The test has been used in other labor-related cases as well to determine if a particular entity is entitled to a statutory exemption because it is a governmental subdivision, agency or instrumentality. These cases include Brock v. Chicago Zoological Society, 820 F.2d 909, 910 (7th Cir.1987) (not exempt under Occupational Safety and Health Act of 1970; 29 U.S.C. § 652(5)); Skills Development Services, Inc. v. Donovan, 728 F.2d 294, 299-300 (6th Cir.1984) (not exempt from Fair Labor Standards Act; 29 U.S.C. §§ 201 et seq.); Popkin v. New York State Health & Mental Hygiene Facilities Improvement Corp., 547 F.2d 18, 20 (2nd Cir.1976), cert. denied, 432 U.S. 906, 97 S.Ct. 2950, 53 L.Ed.2d 1078 (1977) (affirmed the exemption from the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., granted by the EEOC, which had applied the NLRB test from Natural Gas Utility District ). Importantly, within the ERISA context that test was used in Rose v. Long Island Railroad Pension Plan, 828 F.2d 910, 915 (2nd Cir.1987), and Brooks v. Chicago Housing Authority, No. 89-C-9304, 1990 WL 103572 at *1, 1990 U.S. Dist. LEXIS 8233 at * 3 (N.D.Ill. July 2, 1990), and was cited in Hotel and Restaurant Employees and Bartenders International Union Local 54 v. Danziger, 709 F.2d 815 (3rd Cir.1983), vacated on other grounds sub nom. Brown v. Hotel and Restaurant Employees and Bartenders International Union Local 54, 468 U.S. 491, 104 S.Ct. 3179, 82 L.Ed.2d 373 (1984). Thus, we adopt the NLRB test from Natural Gas Utility District to determine if WAMHI is a governmental subdivision, agency or instrumentality for the purposes of ERISA, 29 U.S.C. § 1002(32).
 
 
 20
 The test comprises two prongs, only one of which need be satisfied. The entity is a political subdivision if it is "either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate." Natural Gas Utility District, 402 U.S. at 604-05, 91 S.Ct. at 1749 (quoting the brief of the NLRB; emphasis added). There is a caveat: the Court expressly declined to decide whether " 'the actual operations and characteristics' of an entity must necessarily feature one or the other of the[se] ... limitations to qualify...." Id. at 605, 91 S.Ct. at 1749. This caveat is in keeping with an earlier statement of the Court in a similar vein: "[T]here is no simple test for ascertaining whether an institution is so closely related to governmental activity as to become a tax-immune instrumentality...." Department of Employment v. United States, 385 U.S. 355, 358-59, 87 S.Ct. 464, 467, 17 L.Ed.2d 414 (1966) (federal instrumentalities like the American Red Cross are exempt from state taxation). Consequently, the NLRB test from Natural Gas Utility District has not been deemed definitive in all applications, but we think it appropriate here.
 
 
 21
 We shall look first to the rule's application by the Supreme Court in Natural Gas Utility District and by the courts of appeals in five cases, the outcomes of which bear directly on whether WAMHI is a governmental or private entity.
 
 
 22
 The utility district in Natural Gas Utility District, found to be a governmental entity, was one of 270 such districts established by Tennessee statute and administered by individuals responsible to public officials. It was "administered by a Board of Commissioners appointed by an elected county judge, and subject to removal proceedings at the instance of the Governor, the county prosecutor, or private citizens." Natural Gas Utility District, 402 U.S. at 605, 91 S.Ct. at 1750. Additionally, the utility district was created by order of the county judge after a hearing on the merits; the order was appealable to the state appellate court. Id. at 606, 91 S.Ct. at 1750. Vacancies on the various utility district boards were filled in large counties by popular election and in others by appointment by the county judge when the remaining board members could not agree. Id. at 608, 91 S.Ct. at 1751. Moreover, the utility district had the power of eminent domain; its records were "public records"; and its revenue and the interest on bonds it issued were exempt from income taxation. Id. at 606-07, 91 S.Ct. at 1750-51. As we shall see, none of the features that characterized the Tennessee utility districts as governmental, except possibly for their revenue being tax exempt, are attributes of WAMHI.
 
 
 23
 On the other hand, the Truman Medical Center, Kansas City, Missouri ("Center"), was found to be a private entity. Truman Medical Center, Inc. v. NLRB, 641 F.2d 570 (8th Cir.1981). The Center, formed at the instance of the City of Kansas City, was a not-for-profit corporation organized under Missouri statutes; it was not created by statute or by act of any public official. Id. at 572. The Center operated hospitals under a series of contracts with the City, County, and University of Missouri but not under any legislative directive. Id. The Center was governed by a self-perpetuating board comprising 49 members, 18 of whom were appointed by the City, County, or University; the other 31 members of the board could not be removed by public officials or the general public; and the board's decisions were by majority vote and not subject to review by any governmental body. Id. at 573. The Center's records were not "public documents"; its employees were not covered by any governmental merit system; and it had no sovereign powers, such as the power of taxation or eminent domain. Id. at 572. Many of these characteristics are also attributes of WAMHI.
 
 
 24
 Likewise, the Jefferson County Community Center, one of twenty-two similarly formed, nonprofit Colorado corporations that provided services to mentally retarded and seriously handicapped individuals, was found to be a private entity. Jefferson County Community Center for Developmental Disabilities, Inc. v. NLRB, 732 F.2d 122 (10th Cir.), cert. denied, 469 U.S. 1086, 105 S.Ct. 591, 83 L.Ed.2d 701 (1984). It was formed by individuals, and, although it functioned as part of a state-formulated scheme to provide services to retarded and handicapped persons, it did "not [do so] as a state-created department or administrative arm of government, but essentially as a private contractor." Id. at 125. The governing board comprised 15 members: 8 were appointed, 7 by "public agencies," and 7 were elected. An appointed director could be removed by vote of the board, but an elected one only by a majority of the corporation membership; thus, neither public officials nor the general electorate had the power of appointment or removal. Id. at 125-26. Additionally, the Center had neither the power of subpoena, taxation, or eminent domain nor the power to issue tax-exempt bonds. Id. at 126.
 
 
 25
 Our cases also provide important guidance in applying the NLRB test from Natural Gas Utility District. Three examples suffice. First, the Chicago Zoological Society, operator of the Brookfield Zoo, was found not to be a governmental subdivision despite relationships with the Forest Preserve District of Cook County ("District"), an admitted governmental agency, that intimated otherwise. Brock v. Chicago Zoological Society, 820 F.2d 909 (7th Cir.1987). The Society received 50%-60% of its revenues from taxes raised by the District; the zoo sat on District-owned land; and the District had significant control over the Society's expenditure of revenues, including non-tax revenues. Id. at 911. On the other hand, only one member of the 35-member board of trustees was a public official, and of the 240 governing members who elect the trustees, only four were public officials. Moreover, the District had "no appointment and removal power and no direct role in the zoo's operation and maintenance." Id. at 912. The Society, as one of a number of zoological societies statewide, was not created by state law but was only "approved" to receive government contracts, and, although state officials were instrumental in its founding, they had "deliberately designed it as a private entity to be operated independently of the District and other state agencies." Id. at 911. Lastly, the Society, not the District, signed its employees' paychecks, and its employees were not covered by the state's civil service rules, pension plan or workers' compensation fund. Id. at 912.
 
 
 26
 Second, the nonprofit, corporate operator of a foster home funded in large part by the State of Illinois was not sufficiently controlled by the Illinois Department of Children and Family Services to be a governmental subdivision. NLRB v. Kemmerer Village, Inc., 907 F.2d 661 (7th Cir.1990). Kemmerer Village, Inc., was heavily subsidized by the state and was "seeking to accomplish something the state want[ed] accomplished." Id. at 662-63. That was not enough, however, to make the corporation a governmental subdivision: the state neither created nor acquired it, it was not organized as a governmental entity, and there were no public directors. Id.
 
 
 27
 Third, in NLRB v. Parents & Friends of the Specialized Living Center, 879 F.2d 1442 (7th Cir.1989), we found the not-for-profit Illinois corporation that operated a 24-hour, intermediate-care facility for 100 severely and profoundly retarded adults was not a governmental entity. The corporation was licensed and regulated by the state, and it received state funds. The state had built the facility pursuant to statutory directive. After a 23-month interval during which it was owned and operated by St. Clair County, the facility reverted to the state, which then contracted out its operation. We noted the facility was not the employer; rather, the corporation that managed the facility was the employer. Id. at 1448-49. Furthermore, we stated, "Indeed, if a not-for-profit corporation operates a hospital pursuant to a contract with the state as opposed to a statutory duty, the employer is 'not transformed into a political subdivision of the State.' " Id. at 1449 (citing Truman Medical Center, 641 F.2d at 572; emphasis added). Indeed, this statement by the Parents & Friends court demolishes most of the superstructure of the Shannons' argument that WAMHI is a governmental entity.
 
 
 28
 We now turn to the determinative facts of this case and would ordinarily proceed as have the above cited courts in applying the test. That is, we would first determine, based on the record, if the entity had been created directly by the state or a political subdivision, such as a city, so as to constitute a department or arm of the government. If it had not been, we would then determine, based on the record, if the entity were administered by individuals who are responsible to public officials or the general electorate. However, because neither the parties nor the district court used the NLRB test from Natural Gas Utility District, we must look at the facts--both those upon which the court relied[8] and those reargued by the Shannons--seriatim, applying the test as we go.
 
 
 29
 The City of West Allis built and initially operated what is now known as West Allis Memorial Hospital. In 1963 the City leased the facility to and turned over its entire operation, including accumulated assets and liabilities, to WAMHI. The Shannons first argue that the City's construction and continued ownership of the physical plant shows WAMHI was created by the City, but that does not follow Truman Medical Center, Chicago Zoological Society, and Parents & Friends. Ownership of realty by a government, here the City of West Allis, and the leasing of that realty to a nonprofit corporation, without more, does not prove the corporation was created by the state so as to constitute a department or administrative arm of the government. The Shannons argue, however, that the lessor-lessee relationship does show WAMHI is administered by officials who are responsible to public officials. We think not, as the above cases make clear.
 
 
 30
 On appeal the Shannons argue the lease between the City and WAMHI expired in 1988 by operation of Wisconsin statute and conclude the City, therefore, actually operates WAMH. At oral argument appellees skirted this claim but assured us the lease was still in effect. It matters not. The Shannons do not state they raised the issue in the district court, and it appears they did not. Therefore, this issue is waived. Maciosek v. Blue Cross & Blue Shield United of Wisconsin, 930 F.2d 536, 540 n. 2 (7th Cir.1991).
 
 
 31
 Ten incorporators, nominated by the West Allis Common Council, incorporated WAMHI under the laws of Wisconsin as a private, non-stock, nonprofit corporation. The City Attorney, as authorized by the Common Council, drafted the articles of incorporation and the bylaws. Upon later action by the Common Council, subsequent incorporation, and pursuant to the articles of incorporation, the ten incorporators became the first board of directors of WAMHI ("Board"). Thus, at first blush it might appear the City created WAMHI. Despite the City's nurturing, however, it did not create WAMHI. The ten incorporators did. They did it by following procedures specified in Wisconsin statutes for forming nonprofit corporations, and in so doing they expressly formed a private not a governmental corporation. Contrast the utility district in Natural Gas Utility District with the corporations in Truman Medical Center, Jefferson County Community Center, Chicago Zoological Society, Kemmerer Village, and Parents & Friends. Moreover, the corporation was not created as a department or arm of the government; nor did it become one because it replaced the City as operator of the hospital. Were the law otherwise, it would seem impossible or nearly so for a government to divest itself of any of its operations; there would be no route to privatization, but there is.
 
 
 32
 In addition to arguing that the City created WAMHI the Shannons strongly argue that the Board is controlled by, meaning responsible to, City officials. They point to the following facts: (1) the City "appointed" the first Board, (2) the City Comptroller is always a member of the Board, but, as appellees point out, the position is ex officio, although it is with the right to vote, and (3) only persons who are residents of or have a business interest in West Allis may be Board members.
 
 
 33
 It may be difficult to visualize a political system where what appears to be the power to make initial appointments does not carry with it the power to control. Here, however, the City does not have the requisite control of the Board (1) because it cannot remove any member of the Board and (2) because, having once approved the initial composition of the Board, which may not have been an exercise of the appointment power as envisioned in our cases, it cannot appoint or reappoint any person to the Board. Only the Board, as provided in the articles of incorporation and bylaws, has the power to appoint or reappoint members. This carefully crafted separation of power was meticulously exercised during a crisis that befell WAMHI in early 1970. The Board resigned en masse, but only after it appointed a successor Board, albeit based on recommendations it had sought and received from the Common Council. These limited acts by the City are not sufficient proof that WAMHI is responsible to public officials.
 
 
 34
 Furthermore, the presence of one ex officio but voting City official, the comptroller, on a board of thirteen does not give control to the City or make the Board responsible to City officials. See Truman Medical Center, Jefferson County Community Center, and Chicago Zoological Society. It is reasonable that the City, given its financial interest in the realty that WAMHI operates and in the lease revenues it generates, would want to keep a finger on WAMHI's economic pulse. This does not mean it controls WAMHI's heartbeat. Also, the local residency or business-interest requirement for Board membership is not proof of City governmental control. Lastly, the Board is not elected by the general public. So far, there is no showing that the Board is responsible to public officials or the general public.
 
 
 35
 Two factors did give the district court some cause for concern: namely, WAMHI has prepared various reports for the City, and the City has issued bonds to finance expansion of the hospital facility. Neither one shows creation by a government or responsibility to public officials or the general electorate. The Shannons do not explain how filing a report, even if required periodically, demonstrates the requisite control. If the filing of a mandatory report with the government were sufficient indicia, would not every business in America be a government entity? And the City's issuing tax-exempt bonds to expand its own hospital facility does not demonstrate that WAMHI is a governmental entity of some sort. Would not any prudent lessor act similarly, improving its realty to enhance revenues from a responsible, long-term lessee? More importantly, it was the City that issued the bonds, not WAMHI; WAMHI was not exercising a sovereign power, quite probably because, as a private entity, it had none to exercise. Contrast the power of the governmental entity in Natural Gas Utility District to issue tax-exempt bonds with the absence of that power in the private corporations in Truman Medical Center and Jefferson County Community Center.
 
 
 36
 The Shannons' remaining arguments are that WAMHI was established for a public purpose and that the lease with the City requires WAMHI to transfer its assets and liabilities back to the City upon expiration of the lease. The contracted-for providing of health care to indigents did not persuade the court in Truman Medical Center, 641 F.2d at 572, and the contracted-for providing of health care services in West Allis, Wisconsin, whether to indigents or not, does not persuade us that the corporation operating the hospital facility is a governmental entity. And we cannot see how WAMHI's returning to the City that which it was first granted, WAMH's assets and liabilities, although perhaps in different amounts, identifies WAMHI either as created by the state as a department or administrative arm of government or as responsible to public officials or the general electorate.
 
 
 37
 Lastly, appellees point to the fact that the City and WAMHI maintain separate payrolls, health insurance plans and pension plans. These were important indicia in Chicago Zoological Society that the Society was not governmental; they are no less significant here.
 
 
 38
 For the above reasons we hold the district court correctly found that West Allis Memorial Hospital, Inc., is not a governmental subdivision, agency or instrumentality and that the West Allis Memorial Hospital Employee Benefit Plan, accordingly, is not a governmental plan. The district court, thus, properly found it had subject matter jurisdiction and correctly denied the motion to remand.
 
 RULE 12(b)(6) DISMISSAL
 
 39
 Based entirely on ERISA's preemption of state law claims, the court dismissed the suit for failure to state a claim for which relief could be granted. 29 U.S.C. § 1144; Fed.R.Civ.P. 12(b)(6). We must now hold the district court erred in so doing. Unfortunately, the court did not have the benefit at the time of a recent case of this court which we next discuss.
 
 
 40
 On the same day we heard the present appeal we heard the appeal of a case that had originated in state court as an action for breach of contract, had been removed on the basis of ERISA's grant of federal jurisdiction, and was then dismissed under Rule 12(b)(6). Bartholet v. Reishauer A.G. (Zurich), 953 F.2d 1073 (7th Cir.1992). We initially found the plaintiff-appellant, Bartholet, had raised a claim that related to a benefit plan and, therefore, that ERISA preempted his state common-law claims. Id. at 1077. We added:
 
 
 41
 It does not follow, however, that Bartholet's suit should have been dismissed under Rule 12(b)(6). The district judge believed that until Bartholet amended his pleadings to invoke ERISA, all he had was a claim arising under state common law, and as state law is preempted the complaint failed. The assumption implicit in this approach is that a complaint must plead law as well as fact. Why? Rule 8(a) of the Federal Rules of Civil Procedure says that a complaint must identify the basis of jurisdiction and "contain a short and plain statement of the claim showing that the pleader is entitled to relief." Although it is common to draft complaints with multiple counts, each of which specifies a single statute or legal rule, nothing in the Rules of Civil Procedure requires this. To the contrary, the rules discourage it....
 
 
 42
 A complaint under Rule 8 limits the claim; details of both fact and law come later, in other documents. Instead of asking whether the complaint points to the appropriate statute, a court should ask whether relief is possible under any set of facts that could be established consistent with the allegations.... [T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal.
 
 
 43
 Id. at 1077-78 (citations omitted).
 
 
 44
 As in Bartholet, the district judge here dismissed the Shannons' claims because they erroneously stated their claims were founded in state common law and, also, erroneously denied that ERISA applied. This is not a case that begs dismissal because the plaintiff, represented by counsel who knows the law is otherwise, nonetheless, deliberately seeks to avoid a federal cause of action by filing only state law claims in a state court. See, for example, Maciosek v. Blue Cross & Blue Shield United of Wisconsin, 930 F.2d 536, 540-41 (7th Cir.1991). Rather, only after the Plan intervened in state court and filed a cross-claim and a counterclaim did the Shannons respond by filing their own counterclaim against the Plan. Furthermore, as we observed above, it was more than likely the Plan's intervention to enforce terms of the plan, not the Shannons' response, that mandated ERISA-based federal jurisdiction. 29 U.S.C. §§ 1132(a)(3)(B)(ii), 1132(e).
 
 
 45
 Therefore, we vacate the district court's order dismissing the suit. On remand the court must determine "whether relief is possible under any set of facts that could be established consistent with the allegations," either in the Shannons' counterclaims or in amended counterclaims should the court choose to allow amendment. Bartholet, 953 F.2d at 1078. See, for example, Armbruster v. Benefit Trust Life Insurance Co., 687 F.Supp. 403, 405-06 (N.D.Ill.1988).
 
 
 46
 Lastly, the Shannons already have or, at least, had an ERISA-based suit against the Plan in federal court. The appellees argue the present suit was properly dismissed because it represents an impermissible attempt by the Shannons to split and relitigate claims they asserted or could have asserted in Case No. 87-C-1206. This issue was not decided by the district court, and we shall not either. Therefore, on remand the court may also need to decide that issue along with any others the parties may appropriately raise.[9]
 
 
 47
 Parties shall bear their own costs.
 
 
 48
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 *
 Judge Wood, Jr. assumed senior status on January 16, 1992, which was after oral argument in this case
 
 
 [1]
 We suspect these parties were added because of uncertainty over, inter alia, whether Christen entered the lake from her parents' or neighbors' property and who might be liable
 
 
 [2]
 The court, however, did remand what it considered to be non-preempted claims: the personal-injury, subrogation and reimbursement claims
 
 
 [3]
 James P. and Edith Anne Rachel Shannon appeal pro se and on Christen's behalf. Acknowledging that some parties represented by counsel may, on occasion, attempt to shave various appellate rules and that pro se appellants are not held as strictly to "technicalities" as others, we note the Shannons have carefully followed the Federal Rules of Appellate Procedure and our own Circuit Rules. Their brief and reply brief conform to the requirements, are well written, and adequately cite the record and authority. All required filings were timely
 
 
 [4]
 We use the term "governmental entity" to include, at a minimum, but not distinguish between governmental subdivision, agency, and instrumentality
 
 
 [5]
 This controversy involves three distinct entities: (1) WAMHI, the corporation that operates the hospital facility, (2) the hospital facility itself, including the building and all other real property owned by the City of West Allis and leased to WAMHI, and (3) WAMH, which is what the public perceives as "the hospital," including the facility, the staff and the services offered
 
 
 [6]
 This is because, as defined in ERISA, "[t]he term 'governmental plan' means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of the foregoing." 29 U.S.C. § 1002(32). The parties here focus on whether WAMHI is a governmental "agency or instrumentality." We shall not limit our inquiry to those two terms but will also avail ourselves of definitions of governmental or political "subdivision" where enlightening and appropriate
 
 
 [7]
 Neither party has argued that even if WAMHI is a governmental agency or instrumentality, the Plan is not a governmental plan, although this is the more frequently litigated issue. See, for example, Krystyniak v. Lake Zurich Community Unit District No. 95, 783 F.Supp. 354 (N.D.Ill.1991); Brooks v. Chicago Housing Authority, No. 89-C-9304, 1990 WL 103572, 1990 U.S. Dist. LEXIS 8233 (N.D.Ill. July 2, 1990). Perhaps the parties' stance is because WAMHI is the sole participating employer in this self-funded, self-administered plan
 
 
 [8]
 In its order of May 30, 1991, denying the Shannons' motion to remand, the court stated no reasons for finding the Plan was not a governmental plan but, instead, referred to reasons stated from the bench two weeks earlier. Those reasons are found in the trial record of May 16, 1991, at 20-24
 
 
 [9]
 One issue that the district court should consider even if the parties do not raise it is Mr. Shannon's ability to litigate on behalf of his daughter. James Shannon prosecuted this appeal without the assistance of counsel, and although he is her natural guardian and did a fine job as her advocate, there is a substantial problem. This case carries the caption "Shannon v. Shannon" because Christen brought it against her father, among other defendants. Although her father's status as a defendant may have more to do with an effort to collect insurance than with any desire to move resources from one pocket to another within the family, inter-familial litigation came with the appointment of a guardian ad litem for Christen. That guardian, who owes duties to the judicial system as well as to Christen, see Romasko v. Milwaukee, 108 Wis.2d 32, 321 N.W.2d 123 (1982), is a missing person on this appeal. Whether this has occurred because Mr. Shannon believed that it would assist in avoiding the effect of the guardian's ERISA suit, or because Mr. Shannon is dissatisfied with the guardian's services, or because both sides have concealed this litigation from the guardian, or because the guardian has been inattentive to Christen's needs, is beside the point. The guardian ad litem must be notified of the appeal, and his views discovered. The guardian must be "present at all hearings ... if the [ward] does not have full legal counsel." Wisconsin ex rel. Watts v. Combined Community Services Board, 122 Wis.2d 65, 362 N.W.2d 104 (1985). As we understand Wisconsin's law, the guardian is free to embrace the result of this litigation or to disavow it, and the district court must honor that choice. (We give it leave to do so without any further instructions from us.) If there are legitimate grounds for dissatisfaction with the performance of the guardian ad litem, Mr. Shannon must apply to the court that appointed the guardian rather than proceeding as if the guardian did not exist. The guardian ad litem must either protect Christen's interests diligently or ask the court that appointed him to be relieved; to protect Christen's interests the court pursuant to Wisconsin law then must appoint another guardian ad litem who will be present and participate in all future hearings