**LUMBERMENS MUTUAL CASUALTY COMPANY, Appellant–Defendant,**

v.

**Donna COMBS, Appellee–Plaintiff.**

**No. 49A05–0608–CV–436.**

Court of Appeals of Indiana.

Sept. 20, 2007.

Paul R. Garry, Peter Petrakis, Rachel S. Urquhart, Meckler Bulger & Tilson LLP, Chicago, IL, Michael L. Carter, Spangler, Jennings & Dougherty, PC, Indianapolis, IN, Attorneys for Appellant.

Bridget O'Ryan, Ralph J. Bratch, Bratch & O'Ryan Indianapolis, IN, Attorneys for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

Lumbermens Mutual Casualty Company ("Lumbermens") appeals various rulings and the award of damages, attorney's fees, and prejudgment interest in favor of Donna Combs on her claims for breach of contract and bad faith termination of her long-term disability benefits. We affirm in part, vacate in part, and remand for an evidentiary hearing on attorney's fees.

### Issues

We restate the issues as follows:

I. Whether the trial court correctly concluded that Combs's claims are not preempted by the federal Employee Retirement Income Security Act ("ERISA");

II. Whether the trial court properly denied Lumbermens' motions for judgment on the evidence;

III. Whether Lumbermens has preserved any error regarding the trial court's admission of the testimony of Combs's insurance expert, Mary Fuller;

IV. Whether Lumbermens has preserved any error regarding the trial court's exclusion of the testimony of Lumbermens' insurance expert, Dr. William Warfel;

V. Whether Lumbermens has shown that it was prejudiced by the admission of testimony of Combs's treating physicians, Dr. Craig Johnston and Dr. James Ehlich, regarding matters postdating the termination of Combs's benefits;

VI. Whether the bad faith damages award is supported by the record;

VII. Whether the trial court abused its discretion in awarding Combs attorney's fees; and

VIII. Whether the trial court abused its discretion in awarding Combs prejudgment interest on her bad faith claim.

### Facts and Procedural History[1]

Combs was a senior offsite radiology technologist employed by Hancock Memorial Hospital and Health Services ("Hancock Hospital") and earned approximately $3000 per month before taxes. Hancock Hospital is operated by its board of trustees. Appellant's App. at 116 (affidavit of Hancock Hospital counsel C. Thomas Cone). Combs participated in Hancock Hospital's long-term disability benefit plan ("the Plan"), which is insured and administered by Lumbermens. In 2000, Combs's primary care physician, Dr. Craig Johnston, referred Combs to hematologist/oncologist Dr. Magaral Murali for evaluation of her persistent anemia and increasing fatigue. Dr. Murali diagnosed Combs with myelodysplastic syndrome.[2] Initially, Dr. Murali treated Combs with iron, vitamin B12, and steroids. When this treatment proved unsuccessful, Combs received injec-

---

1. We heard oral argument on August 7, 2007. We commend counsel for the quality of their advocacy.

2. According to hematology/oncology specialist Dr. Robert Hirsch, myelodysplastic syndrome

"is a generalized term that speaks for a dysfunction of the normal bone marrow to produce various cell lines, whether they be white cells, platelets, or red cells." Def. Exh. 28 at 15.

tions of erythropoietin.[3]

Because of her illness, Combs stopped working at Hancock Hospital on July 29, 2001. On February 15, 2002, Combs filed an application for long-term disability benefits with Lumbermens' subsidiary and claims administrator, Kemper National Services ("Kemper"), which later became Broadspire Services, Inc. ("Broadspire").[4] In her application, Combs stated that she was unable to work because of "severe fatigue, weakness, bone & muscle pain, unable to lift or stand, difficulty concentrating, dizziness[.]" Def. Exh. 14 at 98. Combs listed her illnesses as "myelodysplastic syndrome, anemia, fibromyalgia, chronic fatigue syndrome[.]" *Id.* In a letter dated April 16, 2002, Kemper notified Combs that she had become eligible for $1,748.25 in monthly benefits effective January 26, 2002, based on Kemper's determination that she had a disability that prevented her from performing the essential functions of her regular occupation for the following twenty-four months. *Id.* at 326–27. This is known as an "own occ" disability standard.

In a letter dated July 31, 2003, Kemper notified Combs that her benefits would be terminated as of January 25, 2004, unless she was prevented by her disability from performing the essential functions of any gainful occupation "that [her] training, education, and experience would allow [her] to perform[,]" *id.* at 335, and that would pay at least sixty percent of her pre-disability income. Plf. Exh. V at 27. This is known as an "any occ" disability standard. Pursuant to the Plan, an employee cannot receive disability benefits after two years unless the employee meets the "any occ" standard. The letter stated that Kemper would "be conducting a thorough evaluation of [Combs's] claim to determine [her] eligibility for benefits beyond" January 25, 2004, and that a vocational consultant from Kemper might contact her "to discuss [her] work experience and educational background." Def. Exh. 14 at 336.

Also on July 31, 2003, one of Kemper's consulting physicians, hematologist Dr. Marc Fishman, conducted a peer review of Combs's medical records provided to him by Kemper's claims specialist. Dr. Fishman's review reads in pertinent part as follows:

> According to a note from Dr. Mureli [sic] of April 17, 2003, the claimant has myelodysplastic syndrome with chronic refractory anemia. However, from the same note, Dr. Mureli [sic] states "the patient with the erythropoietin has done remarkably well." Physical examination on that date was normal and the claimant's hemoglobin on that date was 11.7. The assessment was that the claimant was doing well with the myelodysplasia. Reviewing the available medical records, the claimant is receiving erythropoietin, generally on a weekly basis. The hemoglobin results from the available records range from 9.9 grams % to 12.0 grams%.[5] An Estimated Physical Abilities form was completed by Dr. Craig Johnson [sic] on May 24, 2003. He states that the claimant has chronic fatigue syndrome and that she is unable to

---

**3.** According to Dr. Murali, erythropoietin, also known as Procrit, "is a hormone that stimulates the [bone] marrow to produce more effective cells[.]" Murali depo. at 12.

**4.** Lumbermens sold Kemper to Platinum Equity in July 2003. Kemper continued to administer Lumbermens' claims as Broadspire.

**5.** In his deposition, Dr. Fishman acknowledged that a normal hemoglobin level for someone Combs's age is on average between 13 and 14 and that Combs's hemoglobin level fluctuated between 9.9 and 12.7 in the medical records that he reviewed. Def. Exh. 25 at 59–60.

work. He indicates that she is never able to lift or carry anything and that she can sit, stand and walk only one hour per day. Also in an Attending Physician's Statement dated May 29, 2003, Dr. Johnson [sic] states that the claimant is unable to work due to chronic fatigue and myelodysplasia and anemia.

Based upon the available information, the claimant is not disabled with respect to her hematologic disorder. While the claimant does have myelodysplastic syndrome, based upon the available information, she is responding very well to the erythropoietin. The hemoglobin has been maintained in a satisfactory level. Accordingly, at the present time, the claimant is not disabled from her own occupation or from any occupation with respect to her hematologic disorder.

The opinions rendered above reflect reasonable medical certainty based upon the available information.

*Id.* at 178–79.

In a letter to Combs dated September 9, 2003, Kemper claims specialist Alicia Lopez summarized Dr. Fishman's review and stated that Kemper had "determined that based on the present information, the *objective medical data provided by [her] treating physicians [did] not continue to support that [she] remain[s] totally disabled from performing the duties of [her] own occupation or any occupation.*" *Id.* at 338. Lopez informed Combs that it was her "responsibility to provide on-going proof of disability." *Id.*

In response, Combs submitted additional medical information, including a statement from Dr. Johnston dated September 24, 2003. Dr. Johnston diagnosed Combs with incapacitating fatigue, depression, myelodysplastic syndrome, refractory anemia, and a torn rotator cuff, and stated that the combination of those maladies rendered her unable "to perform even light work duties[.]" *Id.* at 164. Combs also submitted a letter from Dr. Murali, dated October 9, 2003, which states that she

has been diagnosed to have myelodysplastic syndrome with chronic refractory anemia in addition to chronic fatigue syndrome. She has been quite dependent on erythropoietin injections to improve her hemoglobin. The patient has been disabled because of her problems relating to the chronic fatigue syndrome as well as myelodysplastic syndrome. Consequently, she has also had some depression because of this reason. The patient will continue to be on erythropoietin injection on an indefinite basis at this time. The patient would not be able to resume her regular work with prolonged standing and moving in view of these two medical problems. If you need any further information, please feel free to contact me. The copies of most recent laboratory data are attached.

*Id.* at 73.

In the meantime, Lumbermens had contracted with Allsup Inc. to assist Combs in obtaining social security disability insurance ("SSDI") benefits. For social security purposes, "disability" is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The statute further provides that

[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of

substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). Pursuant to the Plan, Lumbermens' payout is offset by one dollar for every dollar that a claimant receives in SSDI benefits. Tr. at 616. On September 9, 2003, Allsup notified Broadspire that Combs had been awarded SSDI benefits and that Allsup would have to wait at least sixty to ninety days for the benefits information. Lumbermens never requested a copy of Combs's social security disability file.

On November 25, 2003, Lopez, now employed by Broadspire, compiled a general peer review addendum form for the purpose of obtaining a follow-up review from Dr. Fishman. Lopez asked Dr. Fishman to consider his previous peer review, Dr. Murali's October 2003 letter, lab results dated September 12 and 16, 2003, a follow-up note from Dr. Murali dated July 17, 2003, and a mental status evaluation dated July 29, 2003. Dr. Fishman never received the addendum.

On January 8, 2004, Broadspire vocational field care manager Carri Chapman interviewed Combs for the purpose of compiling an employability assessment report ("EAR"), which was completed six days later. The EAR identified twenty occupations with "excellent transferability" and thirty-seven occupations with "good to moderate transferability" for Combs that paid at least sixty percent of her pre-disability income and were within fifty miles of her home in Indianapolis. Def. Exh. 14. at 44–46. Based on the results of the assessment, Chapman concluded that Combs was "employable at this time." *Id.* at 46.

On February 5, 2004, Broadspire claims adjuster Deepali Radtke received notice that Allsup had collected $23,322 in SSDI back benefits, which Lumbermens would receive as an overpayment. On that same date, Radtke decided to terminate Combs's long-term disability benefits claim. Radtke based her decision solely on Dr. Fishman's peer review from July 2003 and a November 2003 peer review from psychiatrist Dr. Elana Mendelssohn, who determined that while Combs "may be experiencing emotional difficulties secondary to her medical conditions, the submitted documentation fails to describe a severity and intensity of psychiatric symptoms in objective mental status to preclude work." *Id.* at 181. Radtke's supervisor, Simon Camaj, approved the termination of Combs's claim.

During the termination process, Radtke completed a claim closure form. The form indicates that the $22,322 overpayment had been recovered and that a cost savings spreadsheet had been completed. *Id.* at 411. The form also indicates that the cost savings for the claim totaled $356,229.90, which represented the benefits that Combs would have received from Lumbermens had she remained disabled until retirement age. Pursuant to law, this amount had been set aside in a separate account for the payment of Combs's claim. Once the claim was terminated, the money was released as a profit to Lumbermens.

Combs was given an opportunity to request a review of the decision to terminate her benefits. On February 19, 2004, Combs requested a review and submitted several statements from her treating physicians. In a statement dated February 19, 2004, Dr. Johnston stated that Combs was suffering disabling fatigue, arthritis, and fibromyalgia that was not psychologically caused. He further stated, "Cannot lift, bend stop or be on feet more than 1

hour. Is Disabled!!!" *Id.* at 196. Dr. Murali's report, dated February 17, 2004, states that Combs

has been known to have severe myelo-dysplastic syndrome and is erythropoiet-in responsive and dependent. She has had significant chronic fatigue syndrome and has been unable to work because of this condition. She also has additional medical problems including severe osteoarthritis and is currently undergoing rheumatologic evaluation as well as orthopedic evaluation. The patient has disproportionate amount of fatigability [due] to the anemia even with correction with erythropoietin and her baseline hemoglobin is around 9.9 or less than 10 most of the time. However, the patient does show a response to the erythropoietin. The patient had been a radiology technician and because of the concern of possible radiation exposure is potentially contributing to her marrow disease. The patient has been advised against resumption of the work in that field at this time. The patient's clinical status is such that she will not be able to continue in any gainful employment at this time.

*Id.* at 204. Combs also submitted a report dated February 27, 2004, from her rheumatologist, Dr. James Ehlich, which indicates that she "appears to have seropositive rheumatoid arthritis." Id. at 198.[6]

In a letter dated April 28, 2004, Broadspire appeal coordinator Sonia Williams informed Combs that Broadspire was "currently in the process of reviewing [her] appeal[,]" that it had "almost completed [its] review of [her] case[,]" and that she would be notified of the determination on or before June 11, 2004. *Id.* at 300. In a second letter dated June 10, 2004, Williams informed Combs that Broadspire was "currently in the process of reviewing [her] appeal request" and that "due to circumstances beyond [its] control, [it would] not be able to give a determination by" June 11. *Id.* at 296. In fact, Broadspire did not request a peer review of Combs's medical records until July 12, 2004.

The following Florida physicians subcontracted by Broadspire reviewed the medical records submitted to them by Broadspire: hematology/oncology specialist Dr. Robert Hirsch, rheumatologist Dr. Yvonne Sherrer, orthopedic surgeon Dr. Lawrence Blumberg, and psychiatrist Dr. Barry Glassman. Pursuant to Broadspire's protocol, the reviewing physicians were not permitted to contact Combs's treating physicians because Broadspire had not specifically requested that they do so. Based on her determination that "there was a discrepancy between the objective information in the medical reports describing the actual abnormalities on exam versus the decision by ... at least one of the treating physicians that [Combs] was completely disabled from performing any occupation[,]" Dr. Sherrer recommended that Combs undergo an independent medical examination ("IME"). Appellant's App. at 509–10. Lumbermens did not arrange an IME for Combs. Dr. Sherrer also opined that x-rays of the affected joints, a bone scan, and "comprehensive musculoskeletal/neurological assessments" would be helpful in evaluating Combs's claim. Def. Ex. 14 at 234. None of these were performed. The reviewing physicians did not have access to medical records more recent than March 2004 and were given an

---

**6.** According to Dr. Ehlich, rheumatoid arthritis is a disorder in which the body's immune system attacks the joints, creating inflammation, pain, stiffness, and fatigue, which "would be like having the flu all the time[.]" Tr. at 125. The condition "tends to cause the tissues in the joints to start to grow[,]" which "can erode into the bones and into joints [and] weaken ligaments." *Id.*

improper definition of "disability" for purposes of determining whether Combs was disabled for purposes of the Plan. That is, the physicians were not asked to account for Combs's training, education, and experience in determining whether she was prevented by her disability from performing the essential functions of any gainful occupation. Def. Exh. 28 at 35. All four physicians determined that Combs was not disabled. After the physicians completed their peer reviews, they shredded the medical records submitted to them by Broadspire.

Williams then submitted Combs's records to a three-member appeal committee that included two physicians. Each member individually notified Williams via telephone that he or she had decided to uphold the denial of benefits. In a letter dated July 23, 2004, Williams informed Combs of Broadspire's decision to deny her appeal.

On December 1, 2004, Combs filed a complaint against Lumbermens in Marion Superior Court for breach of contract and breach of the duty of good faith and fair dealing, seeking compensatory and punitive damages. Lumbermens attempted to remove the case to federal court on the basis that Combs's claims were preempted by ERISA; this attempt was untimely and therefore unsuccessful. Prior to trial, in the context of ruling on Combs's motion to compel discovery, the trial court concluded that Combs's claims were not preempted by ERISA.[7] The trial court denied Lumbermens' motion to certify this ruling for interlocutory appeal. Combs subsequently

withdrew her demand for punitive damages.

A five-day jury trial commenced on March 20, 2006. Over Lumbermens' objection, the trial court admitted the testimony of Combs's insurance expert, Mary Fuller, a former vice president of the individual disability department at UnumProvident, the world's largest disability insurer. Fuller testified that Broadspire "[put] the weight of their own in-house medical reviewers above the weight of [Combs's] treating physicians." Tr. at 404. She noted that Broadspire's claims manual[8] provides for peer-to-peer calls between Broadspire's reviewing physicians and the claimant's treating physicians "when there is a disparity of opinion or difference of opinion" and further provides for an IME if the physicians are unable to "resolve those disparities[.]" *Id.* at 406. Fuller stated that Broadspire's physicians did not contact Combs's treating physicians and that Broadspire "ignored" Dr. Sherrer's recommendation for an IME. *Id.* at 454. Likewise, Fuller noted, Broadspire did not conduct a functional capacity evaluation "to see how long [Combs could] stand, how long [she could] sit, how much [she could] push and pull and lift." *Id.* at 404.

Fuller also testified regarding Broadspire's failure to obtain a follow-up review from Dr. Fishman of Combs's updated medical records; about the lack of documentation in Combs's claim file that Broadspire's reviewing physicians considered the cumulative effect of Combs's multiple ailments (known as co-morbidity) and the interaction among her medications;

---

7. The significance of this ruling will be explained in Issue I *infra.*

8. According to Fuller,
   Claims Manuals are tools that are provided to people within the claims department as a reference for the appropriate ways to investigate claims, and what the company expec-
   tations are around that. They are pretty critical because you want to make sure you are being consistent. So it's important to have policies and procedure documented for training and for reference.
   Tr. at 429.

and that the EAR listed jobs that Combs did not have the skills or training to perform and did not indicate whether the jobs were actually available in the Indianapolis area or mention the wages and requisite experience. Fuller noted the "extreme amount of time" Broadspire took to process Combs's appeal and characterized its letters to Combs during the pendency of the appeal as "misrepresenting their actions[.]" *Id.* at 456, 459.

Fuller took issue with Broadspire's physicians shredding the records they reviewed and the lack of a written record of the appeal committee members' opinions on whether to approve or deny Combs's claim:

> [I]t's critical in the claim process to understand the rationale for why a determination has been made. The claims manual talks about making sure that you document significant facts in the claim file, document any disparities, how those are resolved, and this is a huge decision that Mrs. Combs is dependent upon the company to answer, and there's no way you can tell from the process and from the claim file whether the peer reviewers thought about the claim, what they looked at relative to the claim, how they came up to that determination, and even how they do a voting process which is a secret vote that gets communicated and isn't written down anywhere. All of that is so inconsistent with a fair and objective process. There should be no secrets in a claim file, and whatever opinions exist, should be reflected there with the rationale for that.

*Id.* at 462–63.

On a related note, Fuller stated that Broadspire's claims manual "talks about the role of the [long-term disability] claims examiner, not as someone who does a fair, thorough and objective evaluation, but that the claim examiner's job is to reduce the monetary exposure of claims to the company." *Id.* at 465–66. She also discussed the "inherent conflict" in Broadspire allowing claim specialists both to establish the reserve for a claim and to determine whether to approve or deny the claim:

> [W]hen you have performance evaluations that talk about increasing the profitability of the company and you are placing monetary expectation on the claims person to do reserves and to make decisions knowing that the only way they can contribute monetarily is to reduce the reserve, get back overpayments, or close the claim and recoup the reserve all together [sic]. The only thing a claims person can do to help the company are those three things; reduce the benefit, get overpayments or close the claim. Paying the claim adds financial exposure to the company. So because of this in total, that they are reserving it at the individual level, that they are being measured on how they can reduce the monetary exposure, and their performance evaluations expect them to contribute to the bottom line and it is, in my view, highly inappropriate behavior for the company to ask the claims person to do.

*Id.* at 477, 478.

Fuller further testified that Broadspire's peer review manual

> talks about the fact that the doctors when they are reviewing documents should not be identifying the kinds of things that would support impairment in their analysis of claims, which again, if you are going to show a blind eye to those things that would support a disability determination so that the claim isn't paid, that is going to make a contribution line for the claims person handling that claim.

> . . . .

I think the way in which these file reviews were done was such a narrow focus on the part of the peer reviewers, and the way in which the claims examiners ignored restrictions and limitations from the peer reviewers and recommendations for IME's, the whole, the refusal to obtain additional records, the refusal to talk to the treating physicians, those are all things that allow you to come up with a claim closure. And if you are really trying to be fair and objective, you look at everything and you deal with the outcome of the claim. You don't start out looking for the idea that you are going to reduce the claim cost across the board and increase profitability.

*Id.* at 483, 485. It was also revealed during Fuller's testimony that Lumbermens had been unable to produce the fee schedule pursuant to which it paid. Broadspire for processing Combs's claim. Consequently, Fuller was unable to say specifically whether Broadspire had a financial interest in denying Combs's claim, although she stated that in light of the foregoing considerations, the "tools ... are in place there suggest that ... is to reduce the cost." *Id.* at 498.

On March 27, 2006, the jury found in Combs's favor on the contract claim in the amount of $22,583.75 and on the bad faith claim in the amount of $1,500,000. Lumbermens filed a motion to correct error, requesting either judgment notwithstanding the verdict, a new trial, or a reduction of the damages on Combs's bad faith claim. Combs petitioned for attorney's fees and prejudgment interest. On July 17, 2006, the trial court denied Lumbermens' motion to correct error and awarded Combs attorney's fees in the amount of $507,527.91 and prejudgment interest in the amount of $134,067.98. Lumbermens now appeals. Additional facts will be provided as necessary.

## Discussion and Decision

### I. Applicability of ERISA

■ Lumbermens contends that the trial court committed reversible error in ruling that Combs's claims are not preempted by ERISA. By way of introduction, we note that

[t]he stated purpose of ERISA is to "protect ... participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to Federal courts." *See* 29 U.S.C. § 1001(b) (1998). ERISA creates a federal statutory claim for recovery of "benefits due to [the beneficiary] under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," Employee Retirement Income Security Act of 1974 (ERISA) § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (1994 & Supp.1997). Suits under § 1132(a)(1)(B) may be brought in either federal or state court. *Id.* § 1132(e)(1).

. . . .

ERISA provides for broad preemption of state law claims in 29 U.S.C. § 1144(a) which reads: "[e]xcept as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." The United States Supreme Court has examined the legislative history surrounding § 1144(a) to determine that "the words 'relate to' in [114]4(a) [were used by Congress] in their broad sense." *Shaw v. Delta Air*

*Lines, Inc.*, 463 U.S. 85, 98 [103 S.Ct. 2890, 77 L.Ed.2d 490] (1983).

The courts have focused on the "relate to" language of § 1144(a) and have held that a law "relates to" an employee benefit plan if it has a connection with or a reference to such a plan. *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47 [107 S.Ct. 1549, 95 L.Ed.2d 39] (1987); *accord Shaw*, 463 U.S. at 96–97 [103 S.Ct. 2890]; *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 324 [117 S.Ct. 832, 136 L.Ed.2d 791] (1997). The preemption provision may apply even to laws that are not specifically designed to affect employee benefit plans or to laws that affect the plans only indirectly. *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139 [111 S.Ct. 478, 112 L.Ed.2d 474] (1990).

*Midwest Sec. Life Ins. Co. v. Stroup*, 730 N.E.2d 163, 166 (Ind.2000) (footnote, parenthetical, and some citations omitted) (alterations in Stroup).

The parties do not dispute that Combs's "breach of contract and bad faith claims 'relate to' [the Plan] and therefore fall under the broad preemption provisions of ERISA." *Id.* The question is whether one of the exceptions to those provisions applies, namely, whether the Plan is a "governmental plan." 29 U.S.C. § 1003(b)(1).[9] Pursuant to 29 U.S.C. § 1002(32), "[t]he term 'governmental plan' means a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the

foregoing." The Seventh Circuit has stated that the decision whether the entity that "established or maintained" the plan is a governmental "agency or instrumentality" must be made according to federal law. *Shannon v. Shannon*, 965 F.2d 542, 546 (7th Cir.1992), *cert. denied.*

■ According to Lumbermens, the ultimate significance of all this is that if the Plan is *not* a governmental plan and is therefore preempted by ERISA, then Combs's common law claims

should have been dismissed, subject to their assertion as a claim for benefits under ERISA Section 502(a)(1)(b); 29 U.S.C. § 1132(a)(1)(B).[10] In other words, this claim should have been adjudicated, as an administrative review matter, with the evidentiary record limited to the Administrative Record before Broadspire at the time of the claim denial, all as contemplated by the ERISA statutory regime.

Appellant's Br. at 14; *see Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981–82 (7th Cir.1999) (holding that "district court erred in permitting discovery into [disability benefits plan administrator's] decisionmaking" in ERISA action"; "[W]hen there can be no doubt that the application [for benefits] was given a genuine evaluation, judicial review is limited to the evidence that was submitted in support of the application for benefits, and the mental processes of the plan's administrator are not legitimate grounds of inquiry any more than they would be if the decisionmaker were an administrative agency."). Lumbermens

9. *See* 29 U.S.C. § 1003(b)(1) (stating that ERISA provisions "shall not apply to any employee benefit plan if ... such plan is a governmental plan (as defined in section 1002(32) of this title[.]")).

10. *See* 29 U.S.C. § 1132(a)(1)(B) (providing that a civil action may be brought "by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]").

contends that only Combs's breach of contract claim would survive, as a claim for denial of benefits, which should be remanded for decision in accord with ERISA's substantive provisions. Lumbermens asserts that "[t]his includes reviewing the denial of benefits under the arbitrary and abuse of discretion standard, based on only those records before the administrator when it reached its decision." Appellant's Br. at 21 (citing *S. Ind. Health Operations, Inc. v. George*, 696 N.E.2d 476, 478 (Ind.Ct.App.1998), *trans. denied*,[11] and *Perlman*, 195 F.3d at 981–82). Combs does not dispute this.

Both parties agree that the Seventh Circuit's decision in *Shannon* is controlling here. In that case, Christen Shannon, the severely injured daughter of a hospital employee covered by the hospital's self-funded and self-administered plan, sued her parents and other entities in state court after the plan terminated payments for her care. The health plan intervened as a defendant, and all three Shannons raised counterclaims against the plan. The plan removed the case to federal court on the basis that the plan was governed by ERISA. The district court found that the plan was an ERISA plan, not a governmental plan, denied the Shannons' motion to remand, and dismissed the Shannons' counterclaims as preempted by ERISA. The Shannons appealed.

On appeal, the Seventh Circuit specified that the controversy involved

three distinct entities: (1) WAMHI [West Allis Memorial Hospital, Inc., Shannon's mother's employer], the corporation that operates the hospital facility, (2) the hospital facility itself, including the building and all other real property owned by the City of West Allis and leased to WAMHI, and (3), WAMH [West Allis Memorial Hospital], which is what the public perceives as "the hospital," including the facility, the staff and the services offered.

*Id.* at n. 5. Apparently, it was undisputed that WAMHI was the entity that "established or maintained" the plan at issue in that case.

The court determined that the focus of its inquiry was whether WAMHI "is a governmental agency or instrumentality" for ERISA purposes. *Id.* (footnotes omitted). The court adopted the test "implicitly approved" by the U.S. Supreme Court in *NLRB v. Natural Gas Utility District of Hawkins County, Tennessee*, 402 U.S. 600, 602–03, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971), "to determine if a particular entity is a governmental subdivision, agency or instrumentality" under the National Labor Relations Act. 965 F.2d at 547.

The test comprises two prongs, only one of which need be satisfied. The entity is a political subdivision if it is "either (1) created directly by the state, so as to constitute departments or administrative arms of the government, or (2) adminis-

---

11. *See S. Ind. Health Operations, Inc. v. George*, 696 N.E.2d at 478 ("In *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 [109 S.Ct. 948, 103 L.Ed.2d 80] (1989) the Supreme Court established the rule that courts must apply a *de novo* standard of review in actions brought by ERISA plan participants to challenge the denial of benefits *unless* the plan vests the plan administrator with discretionary authority to make eligibility determinations or construe the plan's terms. When the plan so endows its administrator, the decision of the administrator must stand unless there is an abuse of discretion. *Bruch*, 489 U.S. at 115 [109 S.Ct. 948]. It is only in those cases involving plans that have not vested their administrator with such authority that the court must follow traditional principles of trust law and construe a participant's claim 'as it would have any other contract claim—by looking to the terms of the plan and other manifestations of the parties' intent.' " *Id.* at 112–13 [109 S.Ct. 948].") (parallel citations omitted).

tered by individuals who are responsible to public officials or to the general electorate."

*Id.* at 548 (quoting *Natural Gas Util. Dist.,* 402 U.S. at 604–05, 91 S.Ct. 1746).[12]

The court ultimately found that WAMHI was not a "governmental subdivision, agency, or instrumentality," noting that although the city built and initially operated the hospital, it eventually leased the facility and its operation to WAMHI; that the hospital incorporators nominated by the city council expressly formed WAMHI as a private, not a governmental, corporation; that the city did not have the requisite control of WAMHI's board because it could not remove any member of the board, and because having once approved the board's initial composition, it could not appoint or reappoint any person to the board; that the city comptroller's ex officio position on WAMHI's board did not give the city control of the board or make the board responsible to city officials;[13] and that WAMHI's board is not elected by the general public. The court was not swayed by the fact that WAMHI had prepared reports for the city or that the city had issued bonds to finance expansion of the hospital facility, as neither demonstrated "creation by a government or responsibili-

ty to public officials or the general electorate." *Id.* at 552.[14]

In this case, it is not entirely clear at first glance which entity "established or maintained" the Plan for ERISA purposes. On page 5 of its brief, Lumbermens asserts that that entity is Hancock Hospital's board of trustees. The documents on which Lumbermens relies indirectly support this assertion. Paragraph 10 of the affidavit of C. Thomas Cone, counsel for Hancock Hospital, states that "Hancock County did not establish, sponsor, or maintain the Hancock Memorial Hospital disability plan." Appellant's App. at 117. Paragraph 4(d) of the affidavit of Laura Nichols, Hancock Hospital's human resources team leader, states that "[s]alaries, benefits, etc. (especially the disability insurance benefits) are funded through the Hospital's own revenues and earnings." *Id.* at 118. According to Cone's affidavit, the board of trustees operates Hancock Hospital. *Id.* at 116 (paragraph 4). As such, we think it is reasonable to conclude that Hancock Hospital's board of trustees maintains the Plan for purposes of ERISA.

In ruling on the ERISA issue, the trial court entered findings of fact and conclusions thereon, most of which are undisputed. Many of the findings are reiterated in

**12.** As a caveat, the *Shannon* court noted that the Court in *Natural Gas Utility District* had "expressly declined to decide whether the actual operations and characteristics of an entity must necessarily feature one or the other of these limitations to qualify." 965 F.2d at 548 (alterations in *Shannon* omitted).

**13.** *See Shannon,* 965 F.2d at 551 ("It is reasonable that the City, given its financial interest in the realty that WAMHI operates and in the lease revenues it generates, would want to keep a finger in WAMHI's economic pulse. This does not mean it controls WAMHI's heartbeat.").

**14.** *See Shannon,* 965 F.2d at 552 ("The Shannons do not explain how filing a report, even

if required periodically, demonstrates the requisite control. If the filing of a mandatory report with the government were sufficient indicia, would not every business in America be a government entity? And the City's issuing tax-exempt bonds to expand its own hospital facility does not demonstrate that WAMHI is a governmental entity of some sort. Would not any prudent lessor act similarly, improving its realty to enhance revenues from a responsible, long-term lessee? More importantly, it was the *City* that issued the bonds, not WAMHI; WAMHI was not exercising a sovereign power, quite probably because as a private entity, it had none to exercise.").

the conclusions, which read in pertinent part as follows:

1. .... Both sides agree that the determinative issue is whether Hancock Hospital is a governmental subdivision, agency or instrumentality whose employee benefits are exempt from ERISA.[15]

....

4. The evidence shows that Hancock Hospital meets both prongs of [the *Shannon*] test. The hospital was established by the Hancock County Board of Commissioners after approval of the voters in Hancock County.

The general electorate voted on November 5, 1946 to proceed with the construction of a public hospital. This voting was overseen by a group of election officials known as the Hancock County Election Board and Election Commissioners for the Hancock County Hospital Election. In a special meeting held by the Hancock County Board of Commissioners held on December 27, 1946 the Board certified the results of the election and ordered that a county hospital be established in and for Hancock County pursuant to the provisions of the Indiana statutory provisions which govern county hospitals. The Board of Commissioners authorized the purchase of a site for the facility and the necessary equipment all for an amount not to exceed $300,000.

[After a special election was held pursuant to a petition submitted by Hancock County residents in May 1948, in which a majority of votes cast approved construction of the county hospital, the Board of Commissioners] ordered that a county hospital be established and that the Commissioners appoint a Board of Trustees for the hospital as required by [existing law]. The Commissioners then ordered that taxes be levied to provide the financial support for the hospital and appointed specific individuals to the hospital's Board of Trustees. As a result, [Combs] has established that the hospital meets the first prong of *Shannon* by establishing that the hospital was created by Hancock County to operate as a county hospital in accordance with Indiana law governing county hospitals.

5. [Lumbermens] does not contest the fact that the hospital was established by the Hancock County Commissioners with approval of the voters in Hancock County. Instead, [Lumbermens] relies upon *Shannon* to argue that the hospital was not created by the County. Specifically, the court in *Shannon* found that the City did not create the facility at issue, but rather a group of "ten incorporators" actually created the facility. After gaining control of the project, the ten incorporators followed procedures specified under Wisconsin statutes for forming a private and not a governmental entity. Therefore, the court held that the City did not actually create the healthcare facility because they immediately handed over control to a group of ten incorporators who incorporated the facility as a private entity. Contrary to *Shannon*, Hancock County voters and the County Commissioners created the county hospital. Furthermore, the hospital is not registered with the Secretary of State as a private corporation; rather, the hospital is a public entity governed by the state statute regulating county hospitals.

6. [Lumbermens] further maintains that the hospital does not constitute a

15. Lumbermens correctly notes that it had previously asserted that the determinative issue was whether Hancock Hospital's board of trustees "is a private or governmental entity." Appellant's App. at 80.

department or arm of the government. Contrary to this position, the IRS specifically recognizes the hospital as a governmental entity. Since the hospital is a county hospital and therefore, an agency or arm of Hancock County, it is exempt from federal taxation under § 115 of the Internal Revenue Code.... Accordingly, the United States government recognizes the hospital as a governmental entity.

7. Furthermore, the State of Indiana recognizes the hospital as a governmental entity. For instance, the State Board of Accounts audits the hospital specifically because the hospital is a governmental entity.... The State Board of Health only audits governmental entities.... Moreover, the Indiana Bond Bank issued bonds to the hospital only because it is a political subdivision. Accordingly, the federal government and two state agencies of the State of Indiana recognize the hospital as a governmental entity thus establishing that the hospital constitutes [an] arm of the county.

8. The Court also finds that [Combs] has established the hospital meets the second prong of the *Shannon* test in that the hospital is administered by individuals who are responsible to public officials. The Hancock County Board of Hospital Trustees met for the first time on June 10, 1948 for the purpose of organizing in the manner provided by statute after being appointed by the Hancock County Commissioners. The Hancock County Commissioners appointed the initial board members and has since appointed all other hospital board members. The County Commissioners appoint all new members upon the expiration of a members' four year term or any other vacancy. All of this

has been prescribed by the Indiana legislature and is regulated by the Indiana Code.

9. The hospital operates pursuant to legislation enacted to govern county hospitals. Specifically, the hospital operates under the Indiana County Hospital Law, IC 16–22–2–2. The Indiana County Hospital law mandates that all members of the hospital's Board of Trustees be appointed by governmental officials. Specifically, the statute requires that all members of the Board of Trustees be appointed by the "county executive." IC 16–22–2–2(a). "[T]he members of the Governing Board are appointed by the Board of Commissioners of Hancock County. All four members must be residents of Hancock County." Additionally, the statute requires that "a vacancy on the board shall be filled by the county executive, and the appointee shall be appointed to complete the unexpired term of the member whose office has been vacated." IC 16–[22–2]–2(d). Furthermore, the Hancock County Commissioners may remove a board member if they fail to [fulfill] their responsibility of attending and participating in board meetings (IC 16–22–2–9).

10. Accordingly, the Board of Trustees of Hancock Hospital are appointed by the Hancock County Board of Trustees. The governing board takes an oath to support the Constitution of the United States and the Constitution of the State of Indiana (IC 16–22–2–9). The county treasurer is the treasurer of the Board of Trustees (IC 16–22–2–9). Each member serves a four year term and they be removed by the County Commissioners if they fail to attend board meetings. (IC 16–22–2–6; IC 16–22–2–9) [16] The hospital's operation and

16. Lumbermens correctly notes that the com-        missioners may remove a board member only

the board are governed by Indiana statutes regulating county hospitals. Accordingly, the hospital is administered by individuals who are responsible to public officials and therefore meets the second prong of the *Shannon* test.

11. [Lumbermens] argues that the hospital fails to meet the second prong of *Shannon* because the Hancock County Commissioners do not have the requisite control over the Board of Trustees. [Lumbermens] relies on the facts of *Shannon* to support their argument that the Board is not sufficiently controlled by the Hancock County Commissioners. However, in *Shannon* the board members themselves had the authority to appoint and reappoint individuals to the board, not the City; thus, the City appointed the first board only and had no ability to appoint any further members of the board. Therefore, the court held that the board was not sufficiently accountable to public officials. Unlike *Shannon*, the Hancock County Commissioners appoint board members whenever there is a vacancy on the Board and at the expiration of a board member's four year term. Moreover, the Hancock County Commissioners have the ability to expand the board and did so recently pursuant to IC 16–22–2–7. The board members are also subject to removal if they fail to properly attend board meetings. Additionally, the board's actions are regulated by state statute and the board is subject to audits performed by the State Board of Health. Accordingly, the Board is governed by Indiana County Hospital Law, is accountable to the Hancock County Commissioners and is subject to audits by the State Board of Health. As a result, [Combs] satisfies

the second prong of *Shannon* by showing that the hospital is administered by board members who are responsible to public officials.

12. As shown above, ERISA does not govern this case. Accordingly, the hospital does not comply with ERISA and never has because it is exempt from the statute. None of the necessary filings have been made by the hospital (e.g. Form 5500) with the Internal Revenue Service, which are mandatory under ERISA, e.g., 29 U.S.C. §§ 1021(b)(4), 1023, 1024; IRC § 6058(a); 29 U.S.C. § 1365. Furthermore, [Lumbermens'] own policy belies the arguments made by [Lumbermens] in their motion [to vacate order for discovery]. The policy defeats the argument that ERISA governs this issue by the very fact that there is absolutely no reference to ERISA anywhere in the policy. ERISA, and its corresponding regulations, mandate certain disclosures be made in policies governed by ERISA to notify claimants of their rights under the statute. For instance, there is no "named fiduciary" or "plan administrator" named in the policy as required by 29 U.S.C. § 1102(c). This failure to adhere to the statutory requirements imposed upon ERISA plans generally, in combination with all of the other factors stated above, provides further evidence that no plan was ever established or maintained by the hospital.

13. As shown above, Hancock Hospital was created by the Hancock County Board of Commissioners after approval by Hancock County voters. The initial funds raised to construct the facility were $2,000,000 in taxes levied on residents of the County. The Hancock

upon recommendation by the board. Appellant's Br. at 18 (citing Ind.Code § 16–22–2–9).

County Board of Commissioners selected the initial Board of Trustees for the hospital and has filled any vacancies since that date. The President of the hospital's Board of Trustees in 1981 indicated publicly that the hospital is a County hospital owned by Hancock County. The IRS, State Board of Health and the Indiana Bond Bank all recognize the hospital as a governmental entity. Therefore, the hospital meets both prongs of the *Shannon* test because it was created directly by Hancock County, its Board of Commissioners, and the voters of Hancock County, and the hospital's administrators are appointed by and accountable to public officials.

14. Accordingly, this case is not governed by ERISA because Hancock Hospital is a governmental entity exempt from ERISA; therefore, this case should be determined by state law and the plaintiff is entitled to conduct full discovery under the Indiana Rules of Trial Procedure.

Appellant's App. at 157–63 (some citations omitted).

On appeal, Lumbermens argues that "the trial court's reasoning was wrong from the very start[,]" in that it "identified its focus as whether Hancock Hospital is a governmental subdivision, agency or instrumentality." Appellant's Br. at 17. Although the trial court's findings and conclusions occasionally appear to conflate the concepts of "establishing or maintaining" the hospital itself with "establishing or maintaining" the Plan, we think that its findings regarding the board of trustees are sufficient to support its ultimate conclusion that this case is not governed by ERISA.

The trial court requested proposed findings of fact and conclusions on its own motion. As such,

[s]ua sponte findings control only as to the issues they cover. When a trial court has made findings of fact, we review the sufficiency of the evidence using a two-step process. First, we must determine whether the evidence supports the trial court's findings of fact. Second, we must determine whether those findings of fact support the trial court's conclusions of law. We will set aside the findings only if they are clearly erroneous. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it applies the wrong legal standard to properly found facts.

*Gregg v. Cooper*, 812 N.E.2d 210, 214–15 (Ind.Ct.App.2004) (citations and quotation marks omitted), *trans. denied*. Nevertheless, "[w]here trial court findings on one legal theory are adequate, findings on another legal theory amount to mere surplusage and cannot constitute a basis for reversal even if erroneous." *Borth v. Borth*, 806 N.E.2d 866, 870 (Ind.Ct.App.2004). "We review questions of law under a *de novo* standard and owe no deference to a trial court's legal conclusions." *Tincher v. Davidson*, 784 N.E.2d 551, 553 (Ind.Ct. App.2003).

The trial court's findings regarding Hancock Hospital's board of trustees establish that it meets not only one, but both prongs of the *Shannon* test, i.e., that it was both "created directly by the state, so as to constitute [a department] or [an] administrative [arm] of government" and that it is "administered by individuals who are responsible to public officials or to the general electorate." 965 F.2d at 548. After approval by Hancock County voters, the Hancock County commissioners established Hancock Hospital and appointed the initial board of trustees to operate the hospital in accordance with state law gov-

erning county hospitals. Both the state and federal governments recognize Hancock Hospital as a governmental entity. Such being the case, we agree with the trial court that the board of trustees was created directly by the state so as to constitute an administrative arm of government.

Unlike in *Shannon*, the Hancock County commissioners have appointed all board members since the board's inception, pursuant to Indiana law. Also, the commissioners have exercised their statutory power to expand the board. Upon recommendation by the board, the commissioners may remove a board member who fails to meet statutory attendance requirements. The board members take an oath to support the state and federal constitutions, and the board is governed by state law regulating county hospitals. No single factor here is dispositive, but taken together, they amply support the trial court's conclusion that the board is administered by individuals who are responsible to public officials. Consequently, we affirm the trial court's determination that the Plan is a governmental plan and that therefore Combs's claims are not preempted by ERISA.

## II. Denial of Lumbermens' Motions for Judgment on the Evidence

■ At the close of Combs's case in chief, Lumbermens moved for judgment on the evidence on Combs's bad faith claim. Tr. at 567. The trial court denied Lumbermens' motion. *Id.* at 568. In its motion to correct error, Lumbermens requested that the trial court enter a judgment notwithstanding the verdict, which is properly termed a motion for judgment on the evidence. *See* Ind. Trial Rule 50(E) (abolishing motion for judgment notwithstanding verdict); *see also* Ind. Trial Rule 50(A) (providing that a motion for judgment on the evidence may be made after the party with the burden of proof has completed presentation of his evidence or in a motion to correct error). The two-page motion does not specifically refer to Combs's breach of contract claim and focuses on proof, evidentiary issues, and damages *vis-à-vis* the bad faith claim.[17] *See* Appellant's App. at 258 ("The plaintiff failed to prove bad faith with clear and convincing evidence[.]"). As such, we address Lumbermens' argument only as to the bad faith claim.[18]

Our standard of review is well settled:

When reviewing the trial court's denial of a motion for judgment on the evidence, we will consider only the evidence most favorable to the nonmovant along with all reasonable inferences to be drawn therefrom. We must determine whether there was evidence of probative value supporting each element which would justify submission of the claim to the jury. If there is *any* probative evidence or reasonable inference to be drawn from the evidence or if reasonable people would differ as to the result, judgment on the evidence is properly denied. A motion for judgment on the evidence should be granted only in those cases where the evidence is not conflicting and susceptible to one inference, supporting judgment for the movant.

---

17. Lumbermens did not include its "memorandum of law in support of this motion" in its appellant's appendix. Appellant's App. at 258.

18. In closing argument, Lumbermens' counsel told the jury, "The [breach of] Contract claim, I'll give you that one. That is, I think, a really tough call. I think it really is a tough call as to whether she was disabled from any occupation on March 1, 2004." Tr. at 880–81. Clearly, this statement would undermine any argument that Lumbermens would make regarding a motion for judgment on the evidence on the breach of contract claim.

Thus, our role on review is no different from that of the trial court.

*CSX Transp., Inc. v. Kirby,* 687 N.E.2d 611, 615–16 (Ind.Ct.App.1997) (emphasis added) (citations omitted), *trans. denied* (1998).

Lumbermens recites many of the above-mentioned facts and makes the following argument:

> Broadspire's decision to deny benefits was based on evidence from Combs' own medical records. Broadspire had *six* physicians review Combs' medical records prior to reaching its final denial. These physicians opined that her myelodysplastic syndrome was under control with medication, and that her hemoglobin level would not impair her from working sedentary positions. Nor was her depression of a severity that would impair work. Her rheumatoid arthritis did not prevent her from performing sedentary work.
>
> Further, her treating physician [Dr. Johnston] agreed that she does not have chronic fatigue syndrome or fibromyalgia. Dr. Ehlich believes that she no longer needs medication to treat MDS because the medication for rheumatoid arthritis has alleviated her anemia. Her initial treater, Dr. Murali, testified that another possibility is that her bone marrow has been stimulated so that it is now able to self sustain. Either way, her hemoglobin level responded to medication so that it was discontinued.
>
> Clearly, these facts establish that Lumbermens had a basis to deny benefits wholly consistent with its contractual obligation to grant benefits only if a claimant is prevented from performing the essential functions of "any occupation." Further, these facts irrefutably demonstrate that Lumbermens acted not in bad faith, but with a reasonable basis for determining that Combs did not qualify for benefits.... The decision that Combs was not disabled under the "any occ" standard constitutes, at most, a good-faith coverage dispute with Combs.

Appellant's Br. at 27–28.

In *Erie Insurance Co. v. Hickman,* our supreme court explained that "[a]n insured who believes that an insurance claim has been wrongly denied may have available two distinct legal theories, one in contract and one in tort, each with separate, although often overlapping, elements, defenses and recoveries." 622 N.E.2d 515, 520 (Ind.1993). With respect to the bad faith tort claim, the court stated that

> The obligation of good faith and fair dealing with respect to the discharge of the insurer's contractual obligation includes the obligation to refrain from (1) making an unfounded refusal to pay policy proceeds; (2) causing an unfounded delay in making payment; (3) deceiving the insured; and (4) exercising any unfair advantage to pressure an insured into a settlement of his claim....
>
> .... A good faith dispute about the amount of a valid claim or about whether the insured has a valid claim at all will not supply the grounds for a recovery in tort for the breach of the obligation to exercise good faith. This is so even if it is ultimately determined that the insurer breached its contract. That insurance companies may, in good faith, dispute claims, has long been the rule in Indiana.

622 N.E.2d 515, 520 (Ind.1993).[19]

More recently, this Court has stated that

**19.** Our supreme court has stated that "[t]o prove bad faith, the plaintiff must establish, with clear and convincing evidence, that the insurer had knowledge that there was no le-

[p]oor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present. A finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will. A bad faith determination inherently includes an element of culpability. The lack of diligent investigation alone is not sufficient to support an award. "On the other hand, for example, an insurer which denies liability knowing that there is no rational, principled basis for doing so has breached its duty [of good faith]."

*State Farm Mut. Auto. Ins. Co. v. Gutierrez,* 844 N.E.2d 572, 580 (Ind.Ct.App.2006) (citing and quoting *Erie,* 622 N.E.2d at 520) (citation omitted) (alteration in *Gutierrez* ), *aff'd in relevant part,* 866 N.E.2d 747 (Ind.2007).

Lumbermens acknowledges that "the appeal process did contain minor errors." Appellant's Br. at 29. Lumbermens asserts, however, that a bad faith claim cannot be based on "its failure to obtain a

peer addendum from Dr. Fishman; a delay in the appeal process; 'ignoring' Dr. Sherrer's request for an IME; and alleged (but nonexistent) financial incentive." *Id.* Lumbermens states that "five other physicians did review the information that would have been covered in Dr. Fishman's peer addendum before the final denial of Combs' claim, and the evidence irrefutably shows that all medical evidence submitted was reviewed and there was no selective review of medical information." *Id.* at 29–30.[20] Lumbermens explains that "[t]he appeal process took longer than the prescribed 45 days because three out of 11 claims coordinators were on disability and bereavement leave." *Id.* at 29. Lumbermens does not specifically justify its decision not to arrange an IME for Combs, but merely notes that Dr. Sherrer's request "resulted from her surprise that one of the treaters opined in a manner contrary to the objective information." *Id.* at 30. Regarding financial considerations, Lumbermens notes that forty-four percent of all claims appeals are granted.[21]

gitimate basis for denying liability." *Freidline v. Shelby Ins. Co.,* 774 N.E.2d 37, 40 (Ind. 2002). More recently, the court has stated that this is "not the only way to demonstrate bad faith[,]" suggesting that the four factors mentioned in *Erie* may also be considered by the trier of fact. *Monroe Guar. Ins. Co. v. Magwerks Corp.,* 829 N.E.2d 968, 976 (Ind. 2005). That said, we emphasize that we are reviewing Lumbermens' claim pursuant to a judgment of the evidence standard, i.e., whether there is *"any* probative evidence or reasonable inference to be drawn from the evidence or if reasonable people would differ as to the result[.]" *CSX,* 687 N.E.2d at 615 (emphasis added).

20. In support of this assertion, Lumbermens cites to *"Supra,* pp. 24–26." Appellant's Br. at 30. It is unclear to which document(s) this citation refers. If it refers to Defendant's Exhibit 14, which seems likely, these documents are an August 31, 2004, cover letter from Broadspire's Williams to Combs noting the enclosure of "a complete copy of all mate-

rials relevant to [her] claim" and a July 23, 2004, letter from Williams to Combs notifying her of the denial of her appeal. Neither of these letters directly supports Lumbermens' assertion. In his deposition, Dr. Fishman testified that he had since looked at Combs's records postdating his review and that there was nothing "in any of those records which cast doubt in [his] mind on the opinion [he] rendered in 2003[.]" Dr. Fishman depo. at 81–82.

21. Lumbermens also claims that Broadspire's employees and independent contractors are not "paid based on claims approved or denied." Appellant's Br. at 32. Lumbermens refers to an excerpt from Defendant's Exhibit 1 which states that NATLSCO (Kemper's operating name) and

Client [i.e., Lumbermens and three other entities] acknowledge that any fees paid by Client to NATLSCO shall not be contingent upon the savings obtained in the adjustment, settlement, or payment of losses.

The fact remains, however, that Lumbermens denied Combs's appeal, and that Combs presented sufficient probative evidence to justify submitting her bad faith claim to the jury. Here again, as in the ERISA context, no single piece of evidence is alone sufficient to establish that Lumbermens acted with the requisite "dishonest purpose, moral obliquity, furtive design, or ill will" in terminating Combs's benefits. Nevertheless, the entire body of evidence most favorable to Combs and the reasonable inferences to be drawn therefrom are more than adequate to support the trial court's decision to deny Lumbermens' motions for judgment on the evidence.

A reasonable juror could have found that Lumbermens' claims practices, as implemented in Combs's case, were geared toward terminating her claim and generating profits regardless of her health status. The reviewing physicians were not permitted to contact Combs's treating physicians, all of whom considered her to be disabled; Dr. Fishman never conducted a follow-up review of Combs's updated medical records; and Lumbermens ignored Dr. Sherrer's request for an IME and additional diagnostic tests. Lumbermens also ignored Combs's social security disability determination and then terminated her claim on the same day that it recouped over $23,000 in SSDI back benefits. *Cf. Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir.1998).[22] Upon terminating Combs's claim, Lumbermens realized a profit of over $356,000. In light of this evidence and the numerous additional facts men-

Compensation to NATLSCO shall not be contingent on claims experience but will be based on premiums or number of claims paid or processed.

Appellant's Br. at 31 (citing Def. Exh. 1 at 4 and Appellant's App. at 340). The table of contents for the exhibit volumes indicates, however, that Defendant's Exhibit 1 was never identified or offered into evidence at trial. Finally, Lumbermens contends that "there is no evidence in the record that Lumbermens had any involvement whatsoever in the decision to terminate Combs' benefits." Appellant's Br. at 31. This contention ignores the agency relationship between Lumbermens and Broadspire, on which the jury was instructed at trial.

22. In *Ladd*, an ERISA case, the Seventh Circuit held that the plan administrator's denial of disability benefits was arbitrary and capricious. Prior to the denial, the plaintiff's employer and the plan administrator had assisted the plaintiff in obtaining social security disability benefits. Chief Judge Posner remarked,

The grant of social security disability benefits to Ladd has an additional significance. It brings the case within the penumbra of the doctrine of judicial estoppel—that if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory. The doctrine is technically not applicable here, because MetLife and ITT, the defendants in this suit, were not parties to the proceeding before the Social Security Administration. Yet they "prevailed" there in a practical sense because the grant of social security benefits to Ladd reduced the amount of her claim against the employee welfare plan. If we reflect on the purpose of the doctrine, which is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant, we see that its spirit is applicable here. To lighten the cost to the employee welfare plan of Ladd's disability, the defendants encouraged and supported her effort to demonstrate total disability to the Social Security Administration, going so far as to provide her with legal representation. To further lighten that cost, it then turned around and denied that Ladd was totally disabled, even though her condition had meanwhile deteriorated. In effect, having won once the defendants repudiated the basis of their first victory in order to win a second victory. This sequence casts additional doubt on the adequacy of their evaluation of Ladd's claim, even if it does not provide an independent basis for rejecting that evaluation.

148 F.3d at 756 (citations omitted).

tioned above, we conclude that the trial court did not err in denying Lumbermens' judgment on the evidence on Combs's bad faith claim.

### III. Admission of Fuller's Testimony

■ The trial court denied Lumbermens' pretrial motion in limine to exclude Fuller's testimony. When Combs called Fuller as a witness at trial, Lumbermens objected as follows:

> Under the Law of Bad Faith in Indiana, the issue is whether the claims administrator had actual knowledge of a fact and whether the actual knowledge of Ms. Combs being disabled and intentionally denied a claim despite having that actual knowledge. What the claims administrator knew and what their state of mind was is strictly for the jury to decide.... It's not the type of thing that an expert witness can aid a jury in doing. The expert witness can't help the jury understand what did somebody know because the jury has to be able— has to glean that from the testimony of the witnesses and the content of the exhibits. The same goes for intent. Intent is this state of mind. I believe actually Ms. Fuller will testify she has no opinion about anybody's state of mind, and therefore her testimony would not aid the jury in the deliberation that it's going to have to make later this week.

Tr. at 359–60. The trial court allowed Fuller to testify over Lumbermens' objection. After laying a foundation, Combs offered Fuller "as an expert witness of disability claims handling and management[,]" to which Lumbermens did not object. *Id.* at 382. Fuller then gave nearly two hundred pages of testimony on industry standards for adjudicating disability claims and on Lumbermens' handling of Combs's claim.

On appeal, Lumbermens contends that the trial court committed reversible error in admitting Fuller's testimony. We employ the following standard of review:

> Decisions regarding the admissibility of expert testimony lie within the discretion of the trial court and will be reversed only for an abuse of discretion. An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or the reasonable, probable, and actual inferences to be drawn therefrom.

*Messer v. Cerestar USA, Inc.*, 803 N.E.2d 1240, 1247 (Ind.Ct.App.2004) (citation omitted), *trans. denied.* "We will not reverse the trial court's admission of evidence absent a showing of prejudice." *Stowers v. Clinton Cent. Sch. Corp.*, 855 N.E.2d 739, 748 (Ind.Ct.App.2006), trans. denied (2007).

Indiana Evidence Rule 702(a) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Evidence Rule 704 states,

> (a) Testimony in the form of an opinion or inference otherwise admissible is not objectionable merely because it embraces an ultimate issue to be decided by the trier of fact.

> (b) Witnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions.

Lumbermens reiterates that "[a] finding of bad faith requires evidence of a state of mind reflecting dishonest purpose, moral obliquity, furtive design, or ill will." *Gu-*

*tierrez,* 844 N.E.2d at 580. Lumbermens then asserts that "although expert witnesses may generally give an opinion as to the ultimate fact in issue, if the testimony is in an area in which the jurors are as well-qualified as the expert to form an opinion, the testimony should not be permitted." Appellant's Br. at 36 (citing *Hill v. State,* 470 N.E.2d 1332, 1337 (Ind.1984), and *City of Bloomington v. Holt,* 172 Ind. App. 650, 361 N.E.2d 1211 (1977)). We note, however, that both these cases were decided before the adoption of the Indiana Rules of Evidence in 1994. In *Koziol v. Vojvoda,* 662 N.E.2d 985, 991 (Ind.Ct.App. 1996), we observed that "in more recent cases decided under the Indiana Rules of Evidence (effective January 1, 1994), the trend has been to allow expert opinion testimony even on the ultimate issue of the case, so long as the testimony concerns matters which are not within the common knowledge and experience of ordinary persons and the testimony will aid the jury." *See also Osmulski v. Becze,* 638 N.E.2d 828, 837 (Ind.Ct.App.1994) (stating that "opinion testimony by an expert witness even as to the ultimate fact in issue is not objectionable merely for the reason that it invades the province of the trier of fact" and that "expert testimony is admissible when the expert has some special knowledge which would assist the trier of fact in understanding the evidence or deciding a factual issue.").

Lumbermens sets out numerous instances of what it characterizes as Fuller's testimony regarding the intent of its employees. *See* Appellant's Br. at 37–38 (giving

nine examples); *see also* Appellant's Reply Br. at 23 (giving seven additional examples).[23] It bears mentioning, however, that Lumbermens did not specifically object to this testimony, and that Lumbermens concedes that "an insurance expert may be appropriate where it will assist the jury in understanding complex issues of claims practices." Appellant's Br. at 35 (citing *Peiffer v. State Farm Mut. Auto. Ins. Co.,* 940 P.2d 967 (Colo.Ct.App.1996), *aff'd and remanded,* 955 P.2d 1008 (Colo.1998)). The record indicates that is precisely what Fuller did in this case.

█ In *Gayden v. State,* we explained that

> [t]o preserve a claim of error regarding the admission of evidence, the trial objection must include the specific ground for the exclusion of the evidence. Also, the objection must be specific as to the part or parts of the evidence being objected to. If the evidence is admissible in part and the objection is not confined to the inadmissible portion, no claim of error is preserved if the objection is overruled.

863 N.E.2d 1193, 1198 (Ind.Ct.App.2007) (citations omitted), *trans. denied.* Given that most, if not all, of Fuller's testimony was admissible to assist the jury in understanding disability claims practices in general and Lumbermens' practices in particular, we conclude that Lumbermens has waived any claim of error regarding the objectionable passages excerpted in its briefs.[24]

---

**23.** Lumbermens' contention that Fuller testified about the intent of its employees is undermined by Fuller's acknowledgement on cross examination that she did not have an opinion regarding "anybody's motives in this case" or "any individual's state of mind[.]" Tr. at 521.

**24.** Lumbermens also takes issue with Fuller's testimony that Combs " 'had a worsening of symptoms' " during the claims process on the grounds that Fuller is not a physician. Appellant's Br. at 38 (quoting Tr. at 404). Lumbermens did not object to this statement at trial and has thereby waived any argument on this point.

## IV.  Exclusion of Dr. Warfel's Testimony

■ Lumbermens challenges the trial court's exclusion of the testimony of its expert witness, Dr. William Warfel. At trial, Lumbermens established that Dr. Warfel is a professor of insurance at Indiana State University; that he has been retained as an expert witness in approximately thirty cases since 1997, approximately two-thirds of which involved bad faith breach of contract; and that he teaches a health insurance course that includes "a substantial discussion of disability income contract, also group insurance and ERISA and its implication." Tr. at 806. The trial court excluded Dr. Warfel's testimony on the grounds that Combs's disability policy with Lumbermens was an individual policy, not a group policy, and that Dr. Warfel "has no real world practical experience on these issues in the marketplace, which is where you learn all that stuff." Id. at 814.

■ It is true, as Lumbermens suggests, that "[h]ands-on experience, formal education, specialized training, study of textbooks, performing experiments and observation can provide the foundation for an expert's opinion[,]" and that an expert need not "obtain his knowledge based solely on first-hand experience." Vaughn v. Daniels Co. (WV), Inc., 841 N.E.2d 1133, 1138 (Ind.2006). It is also true, as Lumbermens contends, that Combs's disability policy with Lumbermens is a group policy, not an individual policy. Plf. Exh. V; Appellant's App. at 294 (group insurance certificate).

That said, it is well settled that

[d]uring direct examination, if the trial court determines that a witness may not testify, the proponent of the excluded testimony must make an offer of proof to preserve the ruling for appellate review. The offer must show the substance, relevancy, materiality, and purpose of the excluded evidence in order to enable the reviewing court to determine whether exclusion was proper.

Yoon v. Yoon, 687 N.E.2d 201, 205–06 (Ind.Ct.App.1997), aff'd in relevant part, 711 N.E.2d 1265 (Ind.1999); [25] see also Ind. Evidence Rule 103(a)(2) (stating that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and ... [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by a proper offer of proof, or was apparent from the context within which questions were asked."); Court View Centre, L.L.C. v. Witt, 753 N.E.2d 75, 85 (Ind.Ct.App. 2001) ("The purpose of an offer to prove is to enable both the trial court and the appellate court to determine the admissibility and relevance of the proffered testimony. The failure to make an offer to prove results in a waiver of the asserted evidentiary error.") (citation and quotation marks omitted).

Here, Lumbermens did not make an offer of proof, and the substance of Dr. Warfel's excluded testimony is not appar-

---

**25.** In Yoon, the trial court did not allow the appellant, a physician, to testify as an expert regarding his medical condition in a dissolution proceeding. We stated,

Although we can speculate that Jay would have testified that the condition of his health was deteriorating and that such a condition was relevant and material to the case, Jay bore the burden of providing such information. Here, Jay failed to make an offer of proof. Therefore, we cannot determine whether Jay was prejudiced by the trial court's ruling. Thus, we cannot say that the trial court committed reversible error in excluding Jay's expert testimony. 687 N.E.2d at 206.

ent from the questions asked during Lumbermens' unsuccessful attempt to qualify him as an expert witness. As such, we conclude that Lumbermens has waived any claim of error regarding the trial court's exclusion of Dr. Warfel's testimony.

### V. Admission of Dr. Johnston's and Dr. Ehlich's Testimony

█ Next, Lumbermens contends that the trial court committed reversible error in admitting the testimony of Dr. Johnston regarding an office visit with Combs on March 15, 2006, approximately one week before trial and two years after the denial of benefits occurred. Lumbermens objected based on relevancy and Combs's failure to disclose the evidence before trial. The trial court overruled Lumbermens' objection, allowing Dr. Johnston to "testify about [Combs's] treatment over the course of the years." Tr. at 196. Lumbermens also takes issue with Dr. Ehlich's testimony regarding Combs's physical condition in 2006, which the trial court ruled was admissible as to future damages. *Id.* at 143.

█ Lumbermens argues that this testimony "was simply an effort to unfairly prejudice the jury against [it]." Appellant's Br. at 41. We reiterate that "[w]e will not reverse the trial court's admission of evidence absent a showing of prejudice." *Stowers*, 855 N.E.2d at 748. "[A] bald assertion of prejudice is insufficient to overcome the burden placed upon the complaining party to affirmatively show prejudice. This court will not presume prejudice." *Plan–Tec, Inc. v. Wiggins*, 443 N.E.2d 1212, 1233 (Ind.Ct.App.1983). Even assuming, for argument's sake, that the trial court should not have admitted Dr. Johnston's and Dr. Ehlich's testimony, Lumbermens has not affirmatively shown that it was prejudiced by their brief descriptions of Combs's recent health during the five-day trial. Therefore, we must decline Lumbermens' invitation to reverse and remand for a new trial.

### VI. Bad Faith Damages

█ The jury awarded Combs $1,500,000 in damages on her bad faith claim. Lumbermens speculates that at least $118,000 thereof represents future disability benefits owed to Combs. Lumbermens contends that Combs was not entitled to future benefits, that she failed to prove emotional distress and consequential damages, and that the award is excessive.

This court applies a strict standard when reviewing a jury verdict containing a damage award claimed to be excessive or inadequate. On appeal, we will consider only the evidence that supports the award together with the reasonable inferences therefrom. If there is any evidence to support the amount of the award, even if it is conflicting, this court will not reverse.

Traditionally, the jury has been afforded a great deal of discretion in assessing damage awards. This discretion is not limitless, however. This court will set aside an award of compensatory damages as impermissibly excessive where it is apparent from a review of the evidence that the amount of damages is so great it cannot be explained upon any basis other than passion, partiality, prejudice, corruption, or some other improper element. To warrant reversal, the award must appear to be so outrageous as to impress the Court at first blush with its enormity. Where the damage award is so outrageous as to indicate the jury was motivated by passion, prejudice, partiality, or consideration of improper evidence, we will find the award excessive. The jury's damage award will not be deemed the result of improper considerations if the size of the award can be explained on any reason-

able ground. When the evidence concerning the injury and damages is conflicting, the jury is in the best position to assess the damages and the jury's verdict cannot be said to be based upon prejudice, passion, partiality, corruption, or on the consideration of some improper element.

*Ritter v. Stanton,* 745 N.E.2d 828, 843–44 (Ind.Ct.App.2001) (citations and quotation marks omitted), *trans. denied* (2002), *cert. denied.*

In *Erie,* our supreme court stated that it did not "need to decide the precise nature and extent of damages recoverable" in an action for the breach of the duty of good faith. 622 N.E.2d at 519. The court went on to say, however,

> In tort, all damages directly traceable to the wrong and arising without an intervening agency are recoverable. By contrast, the measure of damages in a contract action is limited to those actually suffered as a result of the breach which are reasonably assumed to have been within the contemplation of the parties at the time the contract was formed. Nonetheless, in most instances, tort damages for the breach of the duty to exercise good faith will likely be coterminous with those recoverable in a breach of contract action.

*Id.* (citations omitted). Lumbermens notes that Combs received $22,583.75 in past contract damages and surmises that the bad faith damages "not coterminous with the breach of contract [damages] might arguably include future damages, consequential damages or emotional distress." Appellant's Br. at 44.

Lumbermens argues that "the award of future benefits is speculative because 'an insured could recover from disability, and thus reach a state where benefits are not due.'" Appellant's Br. at 44 (quoting *Univ. Med. Assocs. of Med. Univ. of S.C. v. UnumProvident Corp.,* 335 F.Supp.2d 702, 711 (D.S.C.2004)). As such, Lumbermens asserts that "[t]he appropriate remedy is to reinstate the aggrieved individual to receive benefits until such time as the disability ceases. This is certainly a possibility in Combs' case, where her anemia has improved with medication, and her rheumatologist agrees that her arthritis could improve." *Id.* (emphasis removed).

We need not address this argument at length. We first observe that it is based on pure conjecture: the jury returned a general verdict and did not specify the elements of Combs's damages. We also note that Lumbermens has not cited to any portion of the five-volume trial transcript in which it made timely and specific objections to any testimony or jury instructions regarding future benefits to preserve the issue for appeal.[26] For these reasons, we deem this argument waived. *See Young v. Butts,* 685 N.E.2d 147, 151 (Ind.Ct.App.1997) ("On review, we will not search the record to find a basis for a party's argument[.]").

Next, Lumbermens asserts that Combs "did not identify any actual financial loss caused by the denial of benefits" and that she "failed to identify any emotional distress damages, much less damages justifying the award in this case." Appellant's Br. at 45.[27] Lumbermens ac-

---

**26.** Lumbermens contends that it "objected to the award of future damages for a breach of the covenant of good faith claim." Appellant's Br. at 43. To support this contention, Lumbermens cites to its trial brief and motion for partial reconsideration, neither of which appears in the record before us.

**27.** In her brief, Combs embarks on a lengthy discussion as to whether emotional distress damages are recoverable in bad faith actions.

knowledges that Combs was angry and hurt after her benefits were terminated, but contends that her emotional distress and depression resulted from her disability, not from the denial of benefits.

Combs observes that mental pain, by its very nature, is not readily susceptible to quantification and that awards therefor are particularly within the province of the jury. *See Ritter,* 745 N.E.2d at 845 ("Physical and mental pain are, by their very nature, not readily susceptible to quantification, and, therefore, the jury is given very wide latitude in determining these kinds of damages.") (citation and quotation marks omitted); *see also Groves v. First Nat'l Bank of Valparaiso,* 518 N.E.2d 819, 831 (Ind.Ct.App.1988) ("We were not, after all, present to review the demeanor of the witnesses as they recounted the events which occurred here and the emotional trauma which the events induced; we are confined to a review of a record which, no matter how accurate and detailed, can never convey the emotions and demeanor of the witnesses."), *trans. denied.* Combs notes that she was already in a weakened physical and emotional state because of her medical condition and the loss of her job and thus was "certainly not in any condition to deal with the stress of the termination of her disability benefits or for the long struggle to get them back." Appellee's Br. at 45. She points to her testimony that her " 'stomach would just be in knots' " when she received letters from Kemper and recounts the stress of possibly losing even more of her income due to the termination of benefits. *Id.* (quoting Tr. at 317). She also points to

Dr. Johnston's testimony that the claims process had been "a very stressful period" and "made her life somewhat more difficult from an emotional standpoint." Tr. at 220. Combs observes that she and her husband Steve had already suffered financial hardship from the loss of her job, which required him to work overtime and do odd jobs that kept him away from his ailing wife.

At this point, we observe that [d]amages for pain and suffering are of necessity a jury question that may not be reduced to fixed rules and mathematical precision. Where the damages cannot be calculated with mathematical certainty, the jury has liberal discretion in assessing damages. Our inability to look into the minds of jurors and determine how they computed an award is, to a large extent, the reason behind the rule that a verdict will be upheld if the award falls within the bounds of the evidence.

*Ritter,* 745 N.E.2d at 845 (citations omitted). In light of the foregoing, and considering only the evidence supporting the award with the reasonable inferences therefrom, we cannot conclude that the award "is so outrageous as to indicate the jury was motivated by passion, prejudice, partiality, or consideration of improper evidence[.]" *Ritter,* 745 N.E.2d at 844. The jury heard evidence that the emotional and financial toll of Lumbermens' termination of disability benefits on the already ailing and jobless Combs was considerable; consequently, we may not second-guess its determination of Combs's damages.[28]

Lumbermens does not contend that Combs is not entitled to emotional distress damages, only that she failed to provide sufficient evidence to support them. Also, Combs contends that Lumbermens "would have this Court use a comparative analysis in evaluating the reasonableness of the verdict[.]" Ap-

pellee's Br. at 47. Lumbermens asks us to do no such thing. Because these are inaccurate characterizations of Lumbermens' argument, we do not address them.

28. Lumbermens asserts that "even though punitive damages were not part of this case, [Combs's] counsel essentially argued to the

## VII.   Attorney's Fees

■   Indiana Code Section 34–52–1–1(b) provides,

In any civil action, the court may award attorney's fees as part of the cost to the prevailing party, if the court finds that either party:

(1) brought the action or defense on a claim or defense that is frivolous, unreasonable, or groundless;

(2) continued to litigate the action or defense after the party's claim or defense clearly became frivolous, unreasonable, or groundless; or

(3) litigated the action in bad faith.

Lumbermens contends that the trial court erred in awarding attorney's fees to Combs.

■   An award of attorney's fees pursuant to Indiana Code Section 34–52–1–1 is afforded a multi-step review. *Inlow v. Henderson, Daily, Withrow & Devoe*, 804 N.E.2d 833, 839 (Ind.Ct.App.2004). "First, we review the trial court's findings of fact under the clearly erroneous standard, and then we review the trial court's legal conclusions de novo. Finally, we review the trial court's decision to award attorney's fees and the amount thereof under an abuse of discretion standard." *Id.* (citation omitted). Here, the trial court stated only that its award of $507,527.91 in attorney's fees was "based on the contingency fee arrangement of one-third, which was in effect between plaintiff and her counsel." Appellant's App. at 20.

■   Lumbermens correctly observes that " 'a contingent fee arrangement between an attorney and his client is not controlling in fixing a reasonable fee to assess against an opposing client.' " Appellant's Br. at 49 (quoting *Venture Enter., Inc. v. Ardsley Distrib., Inc.,* 669 N.E.2d 1029, 1034 (Ind.Ct.App.1996)); *see also Mason v. Mason,* 561 N.E.2d 809, 811 (Ind.Ct.App.1990) ("Contingency fee agreements may not be used as the basis for determining the reasonable attorney fee to be paid by a nonparty to that fee agreement. A trial court's award of attorney's fees based on a contingency fee contract is inappropriate because such arrangements are susceptible to abuse. The party who stands to be awarded attorney fees by the trial court must be content with reasonable attorney fees based upon traditional factors. The determination of the reasonableness of an attorney's fee requires consideration of all relevant circumstances, including the attorney's experience, ability, and reputation, the nature of the employment, the responsibility involved, and the results obtained.") (citations omitted).

Lumbermens notes that Combs's counsel "did not provide even an estimate of actual hours dedicated to this case, other

jury to treat the emotional distress award as punitive damages because it was an opportunity to 'send a message' to insurance companies." Appellant's Br. at 46–47 (quoting closing argument at Tr. 856–57). Lumbermens characterizes the award as "clearly so great as to indicate that the jury was motivated by passion, prejudice, partiality, or corruption, or considered some improper element (such as punitive damages)." *Id.* at 47. We agree with Combs that Lumbermens waived this argument by failing to object at trial. *See Wilson v. Kauffman,* 563 N.E.2d 610, 616 (Ind.Ct.App.1990) (finding that appellant waived claim regarding appellee's allegedly improper remark during closing argument). In its reply brief, Lumbermens invites us to review the challenged remarks for "plain error." Appellant's Reply Br. at 27 (quoting *Cole v. Bertsch Vending,* 766 F.2d 327, 333 (7th Cir.1985)). We decline Lumbermens' invitation. "A party may not sit idly by, permit the court to act in a claimed erroneous manner, and subsequently attempt to take advantage of the alleged error." *Bunting v. State,* 854 N.E.2d 921, 924 (Ind.Ct.App.2006), *trans. denied.*

than a nondescript statement that, based on the court case chronology, 'a great deal of time and labor was involved requiring hundreds of hours of attorney time.'" Appellant's Br. at 50 (citing Combs's motion for attorney fees and costs).[29] *Cf. Posey v. Lafayette Bank & Trust Co.*, 583 N.E.2d 149, 152 (Ind.Ct.App.1991) ("Where the amount of the fee is not inconsequential, there must be objective evidence of the nature of the legal services and the reasonableness of the fee."), *trans. denied* (1992); Ind. Professional Conduct Rule 1.5(a) ("A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following: (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent.").

▆▆ Lumbermens also asserts that there is no evidence that it litigated in bad faith. *Cf. Patel v. United Fire & Cas. Co.*, 80 F.Supp.2d 948, 963 (N.D.Ind.2000) ("[N]ot every finding of bad faith conduct will necessarily subject an insurer to liability for its insured's attorney fees.") (referring to Ind.Code § 34–52–1–1). Lumbermens states that it

> raised non-frivolous defenses to Combs' claims, including that the Plan is controlled by ERISA and that Combs' state law claims are pre-empted, and that the numerous steps of administrative review conducted prior to the termination of Combs' benefits refutes any inference of bad faith. Even the trial court recognized that "there doesn't seem to be a whole bunch of clear law outstanding on law of this particular kind of an action, much less how to try a case or how to instruct a jury. So we're going to make a lot of new laws, a lot of new instructions."

Appellant's Br. at 49 (citing 5/25/06 Hearing Tr. at 2). Lumbermens further notes, " 'It is well established that an award of attorney fees is not justified merely because a party loses on the merits." Appellant's Reply Br. at 30 (citing *Chrysler Motor Corp. v. Resheter*, 637 N.E.2d 837, 840 (Ind.Ct.App.1994), *trans. denied*).[30]

Our ability to address Lumbermens' arguments is significantly hampered by the trial court's failure to enter detailed findings to support its award of attorney's fees, both as to whether Lumbermens defended the suit unreasonably or in bad faith and as to the appropriate amount of

**29.** Lumbermens states that if Combs's counsel devoted 1000 hours to the case, the trial court's award results in an hourly rate of $507.53. Appellant's Br. at 50. If Combs's counsel worked 400 hours, the hourly rate rises to $1,268.82. *Id.*

**30.** Lumbermens argues for the first time in its reply brief that because Combs refused a settlement offer "above and beyond the amount available for damages for the breach of contract claim[,] .... any attorney fees spent litigating the breach of contract claim must be specifically excluded from recovery." Appellant's Reply Br. at 30. "The law is well settled that grounds for error may only be framed in an appellant's initial brief and if addressed for the first time in the reply brief, they are waived." *Magwerks*, 829 N.E.2d at 977.

any fees in light of Professional Conduct Rule 1.5(a). That said, we agree with Lumbermens that basing the award on the contingent fee arrangement, as the trial court appears to have done, is improper. We further conclude as a matter of law that Lumbermens did not litigate the ERISA issue unreasonably or in bad faith, as it was an issue of first impression for both the trial court and this Court, and this case is not on all fours with existing precedent such as *Shannon*. The fact that Lumbermens ultimately did not prevail on the ERISA issue does not justify an award of attorney's fees. We make no determination as to Lumbermens' defense of Combs's breach of contract and bad faith claims, other than to observe that they were also fact-sensitive and that Lumbermens' defeat is itself insufficient to support an award of attorney's fees. In light of the foregoing, we vacate the award of attorney's fees and remand for another evidentiary hearing, with instructions to enter detailed findings consistent with Indiana Code Section 34–52–1–1(b), Professional Conduct Rule 1.5(a), and relevant caselaw regarding the basis, if any, for awarding attorney's fees and for the specific amount of such fees.

### VIII. Prejudgment Interest

■ Indiana Code Section 34–51–4–7 provides that a trial court "may award prejudgment interest as part of a judgment" in a tort action.[31] The purpose of the statute is to address the cost of delay in payment. *Cahoon v. Cummings*, 734 N.E.2d 535, 547 (Ind.2000). Lumbermens appeals the trial court's award of prejudg-

ment interest on Combs's bad faith claim, citing *Bopp v. Brames* for the proposition that

> the crucial factor in determining whether damages in the form of prejudgment interest are allowable is whether the damages were ascertainable in accordance with fixed rules of evidence and accepted standards of valuation. An award of prejudgment interest is proper only where a simple mathematical computation is required. Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest.

713 N.E.2d 866, 872 (Ind.Ct.App.1999) (citations omitted), *trans. denied* (2000); *see also Whited v. Whited*, 859 N.E.2d 657, 665 (Ind.2007) ("[P]rejudgment interest should be awarded only where damages are readily ascertainable and can be calculated by simple mathematical computation.... 'Damages that are the subject of a good faith dispute cannot allow for an award of prejudgment interest.'") (citing and quoting *Bopp*, 713 N.E.2d at 872) (alteration in *Whited* removed).

Specifically, Lumbermens contends that "Combs is not entitled to prejudgment interest on the future damages or emotional distress damages that comprise the lion's share of the $1,500,000.00 bad faith award" because "[t]here has been no delay in payment of her future damages, and her emotional distress damages are not readily ascertainable." Appellant's Br. at 51. We reiterate that the jury entered a general verdict and did not specify the elements of Combs's damages. As such, we cannot say

---

**31.** Indiana Code Section 34–51–4–6 provides in pertinent part that Chapter 34–51–4 does not apply if the person who filed the claim failed to make a written offer of settlement within one year after the claim was filed "or any longer period determined by the court to be necessary upon a showing of good cause[.]" Here, Combs filed her claim on December 4, 2004, and made a settlement offer to Lumbermens on February 6, 2006, i.e., more than one year later. Appellant's App. at 284 (Combs's motion to assess prejudgment interest). Lumbermens does not contend that Combs's claim was filed too late for purposes of Indiana Code Section 34–51–4–6, however.

whether any portion of those damages was "ascertainable in accordance with fixed rules of evidence and accepted standards of valuation." *Bopp,* 713 N.E.2d at 872. We therefore find that the trial court abused its discretion in awarding prejudgment interest to Combs and hereby vacate that award.[32]

### Conclusion

In summary, we hold that the trial court correctly concluded that Combs's claims are not preempted by ERISA; that the trial court properly denied Lumbermens' motions for judgment on the evidence; that Lumbermens waived any claim of error regarding the admission of Fuller's testimony and the exclusion of Dr. Warfel's testimony; that Lumbermens has not shown that it was prejudiced by the admission of Dr. Johnston's and Dr. Ehlich's testimony; that the bad faith damages award is supported by the record; that the trial court's failure to enter detailed findings regarding the propriety and amount of attorney's fees requires a new evidentiary hearing; and that the trial court abused its discretion in awarding prejudgment interest to Combs. We therefore vacate the award of attorney's fees and remand for a new evidentiary hearing and the entry of detailed findings, vacate the award of prejudgment interest, and affirm in all other respects.

Affirmed in part, vacated in part, and remanded.

BAKER, C.J., and BAILEY, J., concur.

---

**32.** Combs cites *Van Winkle v. Nash,* 761 N.E.2d 856 (Ind.Ct.App.2002), *trans. not sought,* for the proposition that a trial court may award prejudgment interest when damages are disputed. *See id.* at 860–61 ("The purpose of the Tort Prejudgment Interest Statute is to encourage settlement and to compensate the plaintiff for the lost time value of money. Construing the statute to preclude an award of prejudgment interest in cases where there are disputed issues would likely discourage settlement as defendants would have incentive to manufacture token disputes of liability or damages in order to avoid prejudgment interest.") (citing *Cahoon,* 734 N.E.2d at 547). We note, however, that our supreme court's statements in *Whited,* which involved a complaint for child support arrearages, are not specifically limited to child support cases and are based on *Bopp,* which involved a breach of fiduciary duty among law partners. In view of the broad language used in *Whited,* we think it prudent to follow our supreme court's latest pronouncement on this topic.